**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **CITIGROUP GLOBAL MARKETS, INC.,** | § | |
| **f/k/a SALOMON SMITH BARNEY, INC.,** | § | |
| | § | |
| **Movant,** | § | **CIVIL ACTION NO. H-05-3849** |
| | § | |
| **DEBRA M. BACON,** | § | |
| | § | |
| **Respondent.** | § | |

**CITIGROUP GLOBAL MARKETS, INC.'S REPLY ON
AMENDED MOTION TO VACATE ARBITRATION AWARD
(ON REMAND FROM THE FIFTH CIRCUIT COURT OF APPEALS)**

**TO THE HONORABLE UNITED STATES DISTRICT COURT:**

Movant, Citigroup Global Markets, Inc., formerly known as Salomon Smith Barney, Inc. ("Citigroup") hereby files its reply on its motion to vacate an arbitration award (on remand from the Fifth Circuit Court of Appeals) rendered in favor of the Respondent, Debra M. Bacon ("Bacon"), in Case No. 04-0917, before the National Association of Securities Dealers, Inc. ("NASD"), and would respectfully show the following:

**I.**
**SUMMARY**

Bacon's effort to fabricate a rational basis for the NASD's unconscionable arbitration award (the "Award") is based on utter fantasy, serious mischaracterizations of the record, and the assertion of New York law, which was never pled or raised in argument at any time in the arbitration. On remand, Bacon now contends that the unauthorized transfers totaled $360,000, ignoring her concession at the hearing that they amounted to only $218,000. She further fabricates a new, imaginary damage calculation of $478,000, never mentioned at the hearing; surmises, without any basis, that perhaps the panel did apportion losses by awarding

only $218,000; and even falsely alleges that her funds were misappropriated for debts on which only Randall was liable, even though she was jointly liable on the business loans. These allegations are not just unfounded, but are contradicted by the record and are sanctionable under Fed. R. Civ. P. 11 insofar as they have been advanced specifically to mislead this Court. Citigroup is considering a motion for sanctions to be filed separately from this brief. Citigroup regrets filing a lengthy reply, but it is necessary to correct the serious misrepresentations of the record.

## II.
### COURT'S DISCRETION TO ALLOW CITIGROUP TO AMEND MOTION TO VACATE

As Citigroup has already briefed,[1] the Court has discretion to allow Citigroup to amend its motion, and apparently has exercised that discretion and granted leave given the Court's issuance of multiple orders setting deadlines for filing the amended motion, the response, and any reply. Moreover, the Fifth Circuit's mandate specifically remanded the case to consider whether the grounds asserted by Citigroup for vacating the award might support vacatur under *any* of the statutory grounds listed in 9 U.S.C. § 10(a). *Citigroup Global Mkts. Inc. v. Bacon*, 562 F.3d 349, 358 (5th Cir. 2009).

The cases cited by Bacon do not preclude Citigroup's right to amend its motion to vacate in accordance with the Fifth Circuit's mandate because, unlike the cases cited by Bacon, Citigroup is not raising new grounds for vacatur, but rather is arguing the very same factual grounds which underscored the panel's "manifest disregard of the law," a doctrine recognized by decades of authority. One of the cases relied upon by Bacon actually confirms

---

[1] *See* "Motion of Citigroup Global Markets, Inc. for Leave to File an Amended Motion to Vacate Arbitration Award (On Remand From the Fifth Circuit Court of Appeals)," filed on April 9, 2009.

the flexibility of the district court on remand when controlling law has radically changed during the pendency of the appeal. *See U.S. v. Bell*, 988 F.2d 247, 251 (1st Cir. 1993) (stating that a matter decided upon before appeal may be "re-opened" on remand when the controlling law has "changed dramatically"). Thus, Bacon has no legal basis for denying Citigroup the right to amend its motion to vacate based on the Fifth Circuit's mandate and opinion. Accordingly, Citigroup will not further waste the Court's time re-visiting the issue.

## III.
### CORRECTION OF THE RECORD

In her Response, Bacon misrepresented the evidentiary record, even as to previously undisputed facts, in order to retool her arguments on negligence, damages, and apportionment of liability. These misrepresentations specifically relate to the following: Bacon's responsibility for the family's finances and business; Bacon's joint liability for the taxes and debt obligations which the money withdrawn by Randall satisfied; Bacon's ownership of and control over the joint account to which the IRA funds were transferred; the actual amount in controversy before the panel; and the extent of Bacon's damages. Citigroup must address each of these misrepresentations, italicized below, in order to correct the record before the Court.

Bacon's Responsibility for Finances and Business

- *"Except at the outset, Debra had nothing to do with business operations."* (Response, p. 9): The undisputed facts are that Bacon approved of the use of her IRA funds to provide cash for the first store[2] and to construct a second

---

[2] Bacon, 9/19/05, pp. 179, 186; Randall, 9/19/05, p. 47; Murrill, 9/20/05, pp. 81-84, 86; R. Ex. 87.

store;[3] Bacon was an officer of the business[4] and had signature authority over the business account;[5] Bacon kept the books for a time and marketed the business;[6] Bacon guaranteed business loans and the lease for the second store;[7] and upon reaching a settlement agreement with Randall, Bacon agreed to allow Randall to run the business and to try to sell it.[8]

- "*There is no evidence in the record that Debra guaranteed the pizza business or any other specific business obligations Randall retired with stolen funds. Indeed the record suggests that he may have used her money to retire obligations for which only he was liable*." (Response, p. 13): Bacon provides no citations to the record to support this spurious claim, because the record flatly reveals that Bacon was either co-maker or guarantor on the following obligations that were satisfied using the funds withdrawn by Randall:
  - A $280,000 note,[9] for the Bacons' second restaurant, to National Bank of South Carolina for which $209,684 was still owed and satisfied at the time the Bacons' business was sold;[10]

---

[3] Bacon, 9/19/05, pp. 179, 190, 237.

[4] Randall, 9/19/05, p. 108.

[5] Bacon, 9/19/05, p. 243; Randall, 9/19/05, pp. 149-51.

[6] Randall, 9/19/05, p. 109.

[7] Bacon, 9/19/05, p. 213; Randall, 9/19/05, pp. 145-47; R. Ex. 97.

[8] Randall, 9/19/05, p. 144; Cl. Ex. 14; R. Ex. 38.

[9] Randall, 9/19/05, pp. 123-24; R. Ex. 55; Bacon, 9/19/05, p. 213.

[10] Arnie, 9/21/05, pp. 171-72; R. Ex. 91, Tab 14.

- A June 9, 1997 Small Business Loan[11] from Comerica Bank, for $210,000 for which $53,626 was paid from the proceeds of the sale of Bacon's business;[12]

- The lease on the second restaurant, for about $68,000 per year, which the sale of the business permitted the Bacons to assign to the new buyer, thus relieving Bacon of the burden of guaranteeing the lease.[13]

## Bacon's Control Over Joint Account

- *"On this analysis, the act of depriving Debra of her rights of ownership and placing the funds beyond her control was sufficient to support an award against Citigroup for the face amount of the instruments....Like the movant in* Mouradian, *Debra had no knowledge of the forgeries or of the payment of taxes or business disbursements, never received any of the proceeds, and had no control or input into how the funds were used."* (Response, p. 16): Citigroup did not deprive Bacon of her ownership or control of her funds. Every transfer in question was from Bacon's IRA to a joint account over which Bacon admittedly had signature authority.[14]  Because she was an officer of ADI, she also had authority by corporate resolution to issue instructions regarding the business account.[15]  Bacon admitted telling her broker Brad

---

[11] Randall, 9/19/05, p. 126; R. Ex. 91, Tab 1, 3.

[12] Arnie, 9/21/05, p. 173; R. Ex. 91, Tab 14.

[13] Randall, 9/19/05, p. 147; Arnie, 9/21/05, pp. 173-74; R. Ex. 91, Tab 14-15.  In addition, Bacon was also co-maker on a home loan for $77,000 in November 2000.   Bacon, 9/19/05, p. 214; Randall, 9/19/05, pp. 124-25; R. Ex. 56.

[14] Bacon, 9/19/05, p. 243; Murrill, 9/20/05, pp. 96-97.

[15] Murrill, 9/20/05, pp. 93-94; Randall, 9/19/05, p. 108; R. Ex. 1 at pp. 1892, 1892A.

Murrill that she and Randall would be funding the second restaurant from her IRA account.[16]    Further, Bacon signed eight letters of authorization to accomplish just that.[17]    Bacon consulted with her accountant regarding the tax consequences of the IRA withdrawals,[18] and the accountant advised her on the timing of the withdrawals in order to minimize taxes.[19]    Finally, she reviewed the monthly statements "from time to time" and balanced the family bank statements quarterly.[20]    Bacon allowed Randall to request the transfer forms for her and never informed Citigroup that she was unable to review her monthly statements which itemized each transfer.[21]    Thus, Citigroup did not deprive Bacon of her rights of ownership and it did not move the funds beyond her control.    By her own choice, Bacon ceded any part of that control to her ex-husband, not to Citigroup.

The Amount in Controversy

- *"At Randall's direction, Debra and he guaranteed $515,000 in business loans and lines of credits, two restaurant leases, an auto loan for Randall's vehicle, credit cards, and related expenditures.*" (Response, p. 9):  While this is wholly contradictory to the misstatements above, there is no testimony in the record that Bacon agreed to these transactions "at Randall's direction."    Instead, the

---

[16] Bacon, 9/19/05, pp. 235-37.

[17] Bacon, 9/19/05, pp. 191-92, 237-38; Murrill, 9/20/05, pp. 108-09; Cl. Ex. 5; R. Exs. 30-35A.

[18] Bacon, 9/19/05, p. 244.

[19] Gordon, 9/20/05, pp. 24-25, 30-31.

[20] Bacon, 9/19/05, pp. 211-12, 241.

[21] Bacon, 9/19/05, p. 229, 234; Murrill, 9/20/05, pp. 106, 109.

record is clear that the personal guarantees were decisions made by both Bacon and Randall jointly. Indeed, Bacon admitted that she decided to employ her IRA funds for the start-up of a second store _after_ discussing the situation with Randall, and she personally signed eight (8) letters of authorization for the transfer of funds.[22] Importantly, these guaranteed debts were completely extinguished upon the sale of the business.

- "_Randall ultimately forged multiple distribution requests in order to pilfer $300,000 from Debra's separate IRA accounts at Citigroup, and $60,000 from her sole and separate severance pay accounts._" (Response pp. 9-10): In an effort to inflate the principal loss and as support for her hypothetical assertion that the $218,000 Award perhaps represented the panel's attempt to apportion responsibility, Bacon improperly relies upon a $360,000 figure from Randall's Property Settlement Agreement[23] when it was conceded at the arbitration that there were _only_ three forged transactions at issue totaling a gross amount of $235,000, or $218,000 net of tax withheld.[24] This $218,000 net figure matched, to the penny, the amount levied by the panel against Citigroup—representing 100% of the principal loss. The odds that the panel apportioned liability are zero, given its dismissal of the claims against Randall.

---

[22] Bacon, 9/19/05, pp. 179-80, 190-92, 237-38; Murrill, 9/20/05, pp. 108-09.

[23] Bacon, 9/19/05, p. 203; Cl. Ex. 14; R. Ex. 38. The $360,000 figure was an estimate to which Bacon agreed in the divorce proceedings. Randall was not represented by counsel but agreed to repay Bacon $360,000 by, among other things, the sale of the business and through monthly payments of $2,083. Randall, 9/19/05, pp. 89-90, 101-02.

[24] _See, e.g._, Claimant's Opening and Closing Arguments, 9/19/05, pp. 30-31; 9/21/05, pp. 222-23; Cl. Ex. 11; R. Ex. 91, Tab 3, 5.

- "*As a result, Debra's quantified potential liability at the time of the divorce exceeded $900,000....Focusing exclusively on her Citigroup losses, Debra's $360,000 in retirement account losses, plus interest of $36,000, plus additional taxes and penalties on the early withdrawals of $82,000 totaled of [sic] $478,000.*" (Response, p. 10):  First, the panel never was presented with an argument by anyone to the effect that Bacon had potential liabilities of $900,000, or even a $478,000 damage analysis.  One can search the record for days, beginning with counsel's opening and closing arguments, and not find such assertions or figures.  Here, Bacon again adopts an inflated $360,000 figure, which was never at issue, and adds that figure to $515,000 in business loans and $82,000 in taxes and penalties to total more than $900,000.  This is misleading because her IRA funds were <u>assets</u> (not liabilities) used to <u>reduce</u> her liabilities, not increase them.  Moreover, it is undisputed that the $218,000 in transfers were used to pay more than $115,000[25] in federal and state income taxes and to keep the business afloat so that it could be sold for $375,000 and the Bacons' joint liabilities paid.[26]  In other words, Bacon deliberately ignores the benefit of more than $500,000 received from the use of her money, as

---

[25] On February 5, 2002, Randall forged an IRA distribution form and deposited the $150,000 net proceeds as a capital infusion in the ADI account (the Bacons' joint business account).  Then, he paid $96,330 to the IRS, satisfying the Bacons' joint tax obligation, covered a negative balance of $35,772 in the joint account, and paid rent (which Bacon had guaranteed) and other general business obligations.  Randall, 9/19/05, pp. 130-31; Arnie, 9/21/05, pp. 147-48, 155-57; R. Ex. 91, Tab 11.  Unbeknownst to Citigroup, the Bacons also owed the State of South Carolina income taxes in the amount of at least $27,000.  In June 2002, Randall requested a disbursement of $18,000 from Bacon's IRA account and the last $10,000 from his own IRA account.  Those funds were transferred to the Bacons' joint account and used to pay those state income taxes.  Randall, 9/19/05, p. 142; Arnie, 9/21/05, pp. 169-70.

[26] Randall, 9/19/05, pp. 145-48.

Arnie testified.[27]   There is <u>no evidence</u> in the record of any principal loss of $360,000 attributable to Citigroup.   Again, Bacon deliberately ignores the undisputed fact that the money transferred to her joint account and subsequently withdrawn by Randall was used for <u>her</u> benefit: to pay joint business obligations and taxes.[28]

Bacon's Damages

- "*However, Randall testified that he had paid back 'nothing' on the unauthorized withdrawals under the PSA and probably could not do so for several years.*" (Response, p. 11):   This is a false recitation of the testimony. Randall did not testify that he could not begin paying Bacon back "for several years."   He testified that he would be unable to repay the <u>entire</u> amount owed for several years.[29]   Randall testified that he intended to repay Bacon the full amount, regardless of any recovery Bacon may have from Citigroup, and that he had sent Bacon $20,000 just two weeks before the arbitration hearing, to reimburse her for 2002 taxes.[30]   Further, he admitted that he had arranged with his employer to have $1,000 monthly payments made to Bacon <u>beginning</u> September 2005, the month of the hearing.[31]   There can be no doubt that Bacon was aware that she received this partial payment from Randall, just as there can be no doubt that counsel is also aware of the same.

[27] Arnie, 9/21/05, pp. 174-75; R. Ex. 91.

[28] Randall, 9/19/05, pp. 145-48; Arnie, 9/21/05, pp. 129-30; R. Ex. 91, Tab 14; R. Exs. 92, 97.

[29] Randall, 9/19/05, pp. 90-91.

[30] Randall, 9/19/05, pp. 103-06, 108; Bacon, 9/19/05, pp. 204-05, 246.

[31] Randall, 9/19/05, p. 107; Bacon, 9/19/05, pp. 206, 255.

- "*Nevertheless, Debra had received nothing on her unauthorized account losses as of the mediation.*" (Response p. 11):  The mediation occurred solely between Randall and Bacon, culminating in their Property Settlement Agreement, dated August 21, 2002.  Bacon conveniently disregards two undisputed facts.  First, her funds extinguised $115,000 in joint tax obligations.  Second, Randall continued to operate the business, in accordance with the Property Settlement Agreement, until it was sold for $375,000 extinguishing the couple's joint bank debt.  The use of Bacon's money kept her business alive so that it could be sold for a profit, a sale which Randall admits, and Bacon does not dispute, could <u>not</u> have occurred had the business been closed due to defaults on those very same obligations.[32]  Had her money not been used and the business been shuttered, Bacon would have retained all the business obligations she jointly owed, including $388,000 in bank loans[33] and at least $115,000 in tax obligations, with penalties and interest mounting and no means of payment.[34]

---

[32] Randall, 9/19/05, pp. 122-23, 141-42.

[33] Randall, 9/19/05, pp. 116-17; R. Ex. 26, 2001 Tax Return, at p. NBSC 00519.  This amount included the amount owed on a $280,000 note to the National Bank of South Carolina which was jointly signed by both Randall and Bacon.  Randall, 9/19/05, pp. 123-24; R. Ex. 55.  Randall also testified that Bacon guaranteed $210,000 on the SBA loan and was a co-maker on a $77,000 home loan.  Randall, 9/19/05, pp. 124-26; R. Ex. 56.

[34] Randall, 9/19/05, pp. 132-34, 142; Arnie, 9/21/05, pp. 169-70.  Arnie testified that Bacon received benefits from the use of her funds to pay taxes and joint business obligations of more than $522,000. Arnie, 9/21/05, pp. 174-75; R. Ex. 91.

<u>Apportionment of Responsibility and Damages</u>

- *"The panel could therefore have concluded that Citigroup's negligence contributed to Debra's losses of $478,000 or more and then, allocated damages on a 55/45 basis as to Citigroup and Randall."* (Response, p. 19): Bacon's imaginary 55/45 allocation of fabricated damages of $478,000 has <u>absolutely no basis</u> in the record at all.[35]  To the contrary, the panel assessed the entire principal loss to Citigroup, and incredibly dismissed Citigroup's claims against Randall, when he admitted to perpetrating a forgery and a fraud against Citigroup.  Therefore, the panel could not have allocated any percentage of the responsibility or damages to Randall, although by law it had to have done so.

<u>Application of New York Law</u>

- *"Pursuant to a Uniform Submission Agreement mandating the application [sic] New York substantive law, a panel of three arbitrators heard the case, none of which were lawyers."* (Response, p. 12):  The Uniform Submission Agreement is a party's representation and agreement to submit to the NASD's jurisdiction to arbitrate the case.  It does NOT mandate the application of New York law.[36]  The <u>absolute</u> truth is that <u>neither party</u> pled New York law, <u>neither party</u> argued or presented New York law in any form, and the panel <u>did not</u> have New York law before it.  *See infra* at pp. 14-15.

---

[35] Note also that 55% of $478,000 is $262,900, and 45% is $215,100.  The panel did not award either sum against Citigroup.

[36] Arbitrators' Ex. 1, 9/19/05, p. 16.  For the Court's convenience, copies of Bacon's and Citigroup's uniform submission agreements are attached as Appendix A, hereto.

Hearing Testimony

- *"Thirdly, Tom Gordon, a tax consultant, called by Citigroup, testified that the unauthorized withdrawal of $218,000 from Debra's retirement funds generated additional income taxes and penalties of $82,000."* (Response, p. 19): Once again, this is an unabashed falsehood. Tom Gordon was Bacon's witness. He was <u>not</u> called by Citigroup.[37] Nor was Tom Gordon a tax consultant. He was merely an unlicensed assistant to the accountant who advised the Bacons with regard to the timing and tax consequences of their IRA transfers.[38]

- *"Numerous facts support a rational conclusion that Citigroup acted negligently and in bad faith. These include the facts that…Debra's signature should have been reviewed by both the 'operations' and 'compliance' sections, and also, approved by management; that the failure to do so was in violation of company policy…."* (Response, pp. 19-20): Citigroup's policy did not require review of the forged signatures. Jane Mouser, Assistant Branch Manager, presenting evidence of Citigroup's company policy, testified that Citigroup does not inspect the signatures for first-party transfers, *i.e.*, transfers from one of Bacon's accounts to another.[39] Bacon misleads the Court by

---

[37] Gordon, 9/20/05, p. 5. In correspondence this week, Bacon's counsel concedes that this statement was a mistake and asks that we inform him of other mistakes.

[38] Gordon is not a CPA but admitted that Scott Powell, of his firm, prepared the Bacons' 2000 and 2001 tax returns (Gordon, 9/20/05, pp. 19-20; R. Exs. 19-20), kept the monthly books for the Bacons' business (Gordon, 9/20/05, pp. 19-20, 34-35), was aware of the financial condition of the business (Randall, 9/19/05, pp. 58, 114) and advised the Bacons on tax matters, including the timing of withdrawals "to mitigate some of the tax liability" (Gordon, 9/20/05, pp. 24-25, 30-31).

[39] Mouser, 9/21/05, pp. 17-18.

citing speculative testimony of the broker, Brad Murrill.  As described herein at pages 18-20, Murrill testified that he had no personal knowledge of Citigroup's management review process relevant to these transfers.[40]  Thus, there is no evidence that Citigroup violated its review policy, and there is no evidence that its policy violated any industry standard.  In her brief to the Fifth Circuit, Bacon tellingly opined that the failure to review the signatures was only "in *arguable* violation" of policy.[41]  Her use of the term "arguable" underscored the truth—that Citigroup did not violate its policy regarding signature review.

By slipshod interpretation of what is otherwise undisputed in the record, Bacon presents this Court with a warped version of the facts before the panel.  The Court should not be misled by these deliberate distortions of the record and the facts.

## IV.
### ARGUMENT

Bacon's response is built upon imaginary facts and law never presented in arbitration, all in an effort to counter the irrefutable fact that the panel granted Bacon a windfall and laid the entire responsibility for Randall's fraud at the feet of Citigroup, in disregard of Texas law.  Now she attempts to bolster an unsupportable result in reliance upon New York law, which is addressed below.

---

[40] *E.g.*, Murrill, 9/20/05, pp. 138-39.

[41] Bacon's "Brief of Plaintiff-Appellant" to the Fifth Circuit, p. 25.

A.    The Panel Could Not Have Applied New York Law

Before the Fifth Circuit, Bacon began morphing her legal argument far away from the record, arguing for the first time that the panel's decision was supportable under New York law. Bacon now does the same before this Court.[42] Incredibly, New York law never was even pled, briefed or otherwise brought to the panel's attention by Bacon, even though Citigroup's counsel expressly briefed the panel on Texas law and argued it in opening and closing. While the Citigroup Client Agreement provided that it will be construed under New York law, this was never pled at the arbitration. Neither Bacon's Statement of Claim nor her brief to the panel raised New York law. Indeed, Bacon briefed and asserted causes of action under the Texas Business and Commerce Code, the same Code upon which Citigroup relies in its amended motion to vacate.[43]

Reliance upon foreign law must be pled or it is waived. *See Malnove Inc. of Nebraska v. Hearthside Baking Co., Inc.*, 951 F.Supp. 151, 153 (N.D.Ill. 1997) (holding that party "cannot try this case under Illinois substantive law and then complain two and one-half months after judgment that Nebraska law should have been applied"); *Brown v. Lanier Worldwide, Inc.*, 124 S.W.3d 883, 894 n.20 (Tex. App.—Houston [14th Dist.] 2004, no pet.) ("However, if, as in this case, a party has not pled and proved the laws of the foreign jurisdiction, they are presumed to be the same as the laws of Texas."). Further, absent some "manifest injustice" which Bacon has neither argued nor proven, the parties are bound by the

---

[42] Notably, Bacon did not give notice of or present New York law to this Court in response to Citigroup's original motion to vacate. Nor does Bacon offer any reason for her failure to give notice of her intent to assert New York law either to the arbitration panel or to this Court.

[43] In her "Response to Respondent's Brief on Selected Legal Issues," Bacon specifically argues claims under Sections 17.46, 27.01, and 4.406 of the Texas Business & Commerce Code. *See* Arbitrators' Ex. 1.

law they argued in the case, Texas law. *American Int'l Trading Corp. v. Petroleos Mexicanos*, 835 F.2d 536, 540 (5th Cir. 1987).

Ironically, if New York law did apply, then there would be no question that the resolution of this matter would be governed by the precedent of *Stolt-Nielsen SA v. AnimalFeeds Int'l Corp.*, 548 F.3d 85, 93-95 (2d Cir. 2008), in which the Second Circuit viewed the "manifest disregard of the law" doctrine as being part of the enumerated grounds for vacatur under the FAA.. *Stolt-Nielsen,* 548 F.3d at 94.  The Second Circuit plainly recognized that parties to an arbitration agreement do not agree to a "lawless award:"

> We must therefore continue to bear the responsibility to vacate arbitration awards in the rare instances in which "*the arbitrator knew of the relevant [legal] principle, appreciated that this principle controlled the outcome of the disputed issue, and nonetheless willfully flouted the governing law by refusing to apply it.*" At that point the arbitrators have "failed to interpret the contract at all," for parties do not agree in advance to submit to arbitration that is carried out in manifest disregard of the law.

*Stolt-Nielsen,* 548 F.3d at 95 (emphasis added) (internal citations omitted).  In other words, merely substituting the arbitration hall for the courtroom does not provide the arbitrators with a basis for reshaping the law as they see fit.  Under the *Stolt-Nielsen* reasoning, the Award here must be vacated.

Most importantly, however, there is nothing in the record of the arbitration hearing that remotely suggests that the panel ever knew of or considered New York law.  That the arbitrators would have had to magically divine the law of New York, in the absence of any presentation, conclusively proves that its assertion now is illusory, wholly devoid of support in the pleadings, the hearing briefs, or the hearing transcript.

B.    The Panel's Award Cannot Stand Under Texas Law

Bacon cannot, and does not, rationally refute Citigroup's legal arguments that, under governing Texas law, Bacon incurred no damages attributable to Citigroup because, as Bacon concedes in her Response, (1) the funds withdrawn were used for her benefit[44] and (2) Randall has already agreed to repay the money.[45]   Bacon was required to show that she was damaged by the unauthorized transfers.   TEX. BUS. & COM. CODE § 4.103, cmt. 6 (requiring both liability of the bank "and some loss to the customer or owner").   Because Bacon received the benefit of the proceeds from the unauthorized transfers, she cannot recover from Citigroup as she has suffered no loss.   *See La Sara Grain Co. v. First Nat'l Bank of Mercedes*, 673 S.W.2d 558, 563 (Tex. 1984) (held, in an action for wrongful payment of checks and unauthorized loans, that plaintiff was only entitled to recover for the checks paid, less the credit for the funds from which the plaintiff benefitted); *Temple v. FDIC*, 988 F.2d 24, 27 (5th Cir. 1993) (concluding, "[the drawer] has more than adequately been compensated for any loss he may have sustained.   He cannot now use his circumstance as a mechanism to recover an even greater award, one that is not owed.").

Further, under Texas law, any damages assessed had to be apportioned among Randall and Bacon as well, a mandate which the panel rejected.   TEX. BUS. & COM. CODE

---

[44] Response, p. 11 ("Randall used proceeds from the forgeries of $114,330 to retire taxes and penalties and used the remaining $103,670 in the business."), ("Net of expenses, Debra received approximately $22,000 from the sale.").

[45] Response, p. 10 ("In the property settlement agreement...Randall agreed to try to sell the business, retire the outstanding debt, and repay Debra $360,000 plus $36,000 in interest in monthly installments of $2,083.00."), p. 15 (referring to Randall's promise to repay Bacon).   Thus, there is no dispute that the panel's Award allows Bacon to recover three times for the $218,000 at issue in this matter: first, when the money was used to pay taxes and retire debt for her benefit; second, when Randall agreed to repay the money, plus some, to Bacon; and third, when the panel improperly and without legal justification awarded $218,000 in damages to Bacon and against Citigroup.

§ 4.406(e).  Randall's intentional culpability was established as a matter of law.  He admitted on the record that he forged three letters of authorization, that he informed no one at Citigroup of his nefarious acts, and that he intended to deceive Citigroup as to the validity of the transfers.[46]  Moreover, Bacon was at least partially responsible too, having admitted that she did not review her account statements or confirmation letters[47] relating to these transfers, that she relied upon Randall to deal with her broker, that she never told Citigroup that she was somehow prevented from reviewing her statements, and that she did not inform Citigroup of the unauthorized withdrawals within thirty days (except for the last transfer of $18,000), as required by TEX. BUS. & COM. CODE, § 4.406.[48]  *See also American Airlines Employees Fed. Credit Union v. Martin*, 29 S.W.3d 86, 92 (Tex. 2000) ("As a result, if the bank provides sufficient information, the customer bears the loss when he fails to detect and notify the bank about unauthorized transactions.").

Bacon hypothesizes that the panel may have apportioned responsibility by concocting an exaggerated damage model of $478,000, without any support in the record, and then proposing that Citigroup was assessed only $218,000 in the Award.  *See* Response, pp. 19, 23.  However, Bacon's counsel argued in opening and closing that the principal loss was only $235,000, so the award of $218,000 was equal to the net amount, after taxes withheld.[49]

---

[46]  Randall, 9/19/05, pp. 55, 59, 151-53.

[47]  Sending confirmation letters following each IRA distribution request was another safeguard employed by Citigroup against unauthorized transfers/withdrawals.  Mouser, 9/21/05, pp. 24-25, 42-43.  Bacon's failure to review her confirmation letters rendered this safeguard pointless.

[48]  Bacon, 9/19/05, pp. 228-30, 234; Murrill, 9/20/05, p. 78; Arnie, 9/21/05, p. 134.  Given her obligation under the client account agreements to notify Citigroup within ten days of any discrepancies in her accounts, her failure to do so can only be deemed as negligence.  Mouser, 9/21/05, pp. 43-44; Murrill, 9/20/05, pp. 72-75.  *See, e.g.*, R. Ex. 3 at p. 2105; R. Ex. 9 at p. 2111; Cl. Ex. 1 at pp. 69, 72.

[49]  *See also* Cl. Ex. 11.

The only evidence in this record is that Citigroup was assessed with 100% of that net loss. The panel did not allocate fault at all regarding those three transfers.

Finally, Bacon did not address Citigroup's argument on the panel's award of attorney's fees at all, thus conceding that the award of fees was not rationally referable to the facts or the law and was an excess of the panel's authority because there was no legal basis for the panel's award of fees.

## C.    The Testimony of Brad Murrill

Bacon argues that apportionment of fault was not required because Citigroup paid the unauthorized transfers negligently and in bad faith.  To support this argument, Bacon has tried to concoct an internal policy out of non-existent testimony or the supposition of a former employee, Brad Murrill, who had not been personally involved in the approval process.  *See, e.g.*, Response, pp. 1 ("in violation of its own internal procedures, failed to examine the signatures"), 3 ("…Citigroup's conduct in failing to examine the forged instruments was negligent and in bad faith").[50]

The record is quite clear that Murrill, who no longer was employed with Citigroup and had not been a supervisor of any kind, was able to testify only about those aspects of a distribution request with which he was familiar (*i.e.*, the client's verbal request for a distribution and transmittal of a written request form to the client).  Other than understanding that "management" reviewed the requests, Murrill demonstrated no knowledge concerning

---

[50] Despite Bacon's recitation of several "facts" which she claims support a conclusion that Citigroup acted negligently or in bad faith (Response, pp. 19-21), the facts recited do not reflect any wrongful act or wrongful failure to act by Citigroup.  For example, Bacon cites as her supporting facts the following, among others: that Randall forged the withdrawals, that Bacon did not authorize the transfers, and that Citigroup obtained signature cards from Bacon.  The only act or failure to act that is <u>repeatedly</u> emphasized and relied upon throughout Bacon's response is the fact that Citigroup did not examine the signatures on the forged distribution requests. *See* Response pp. 17, 19, 21, 23, 24, and 25.

the review procedure, whether practiced by managers in operations or compliance, as

evidenced by this cross-examination:

> Q:    What policy did Smith Barney have in effect to
>        prevent an unauthorized distribution from Ms.
>        Bacon's account by somebody forging her name?
>
> A:    I don't know that.
>
>            ...
>
> Q:    Who was assigned to review them?
>
> A:    There were several people that work in operations.  So, I
>        don't – I don't know.
>
>            ...
>
> Q:    Were you required to obtain any form of authentication
>        of the signature on the form as part of Smith Barney's
>        policy?
>
> A:    I don't know.  I don't know.[51]

According to Murrill, once the signed distribution request comes in, his assistant takes

the request and begins some form of "management review" process which Murrill neither

understood nor could articulate:

> Q:    What does Smith Barney review in connection with a
>        distribution request?
>
> A:    I don't know what Smith – Smith Barney would review.
>
> Q:    Are you involved in the process of authorizing the
>        distribution?
>
> A:    No, sir.

---

[51] Murrill, 9/20/05, pp. 151-52.

Q:    Do you review the Distribution Request Form when it comes in?

A:    No, sir. [52]

Murrill himself had no role in the review process, no role in authorizing a distribution, and did not even know what that review and authorization process entailed. Murrill's testimony is no evidence whatsoever as to Citigroup's internal processes or policies regarding IRA distributions and signature review.

In contrast, Assistant Branch Manager Jane Mouser did provide knowledgeable testimony as to the review process, testimony which was unrebutted. Mouser testified as to Citigroup's review process, which was never shown to be commercially unacceptable or disfavored in the industry. Mouser testified that a signature comparison is done if funds are transferred to an account involving a change of ownership, *i.e.*, to a third party.[53] As to the three forged distribution requests, Mouser testified that there was no requirement to compare the signature to that on the client agreement because there was no change of ownership. The forged distribution requests merely transferred funds from one account over which Bacon had ownership and signature authority to another (albeit jointly with Randall). The other scraps of testimony cited by Bacon are not related to the review process and present no evidence of Citigroup's bad faith or negligence.[54] In light of this record, there is no basis upon which an arbitrator could conclude that Citigroup acted in bad faith or negligently.

---

[52] Murrill, 9/20/05, pp. 138-39.

[53] Mouser, 9/21/05, pp. 17-18.

[54] *E.g.,* Bacon argued that the single forged IRA distribution request, in February 2002, for $165,000 inexplicably "got turned into three," noting that it was copied in order to withdraw money from three separate IRA accounts. Response, p. 20. This transaction, explained at arbitration and raised before this Court, is not material to the governing principles of law. It is undisputed that there "wasn't enough money in any one account to process the request." Mouser, 9/21/05, p. 23. Murrill testified also that

D.    The Panel's Dismissal of Citigroup's Claims Against Randall Remains Inexplicable

Bacon imagines that the panel may have dismissed Citigroup's claims against Randall, the admitted forger, because it found them not worthy on the merits. Response, p. 18. This is flatly impossible. To the contrary, by dismissing the claims, the panel refused to adjudicate them. The panel's refusal to adjudicate Citigroup's claims against Randall, who admitted trying to deceive Citigroup, represents shocking evidence of bias and is tantamount to an indefinite and, indeed, non-final award.

Finally, Bacon's own arguments on this issue are contradictory, reflecting the utter absence of a rational basis for the panel's refusal to adjudicate the claims against Randall. According to Bacon, a "knowing tortfeasor" is not entitled to contribution. Response, p. 17. Yet, Bacon also argues that Citigroup alone should be responsible for the damage Randall knowingly caused (if there is any actual damage). Response, p. 18. Neither Bacon's argument, nor the panel's refusal to act, are rationally inferable from the facts or the contract in this case. Moreover, the panel's action in assigning all liability to Citigroup and releasing Randall for his intentionally tortious conduct can only be viewed as evident partiality and an excess of power, properly vacated under Section 10(a)(2) and (4) of the FAA.

## V.
### CONCLUSION

The panel's bias and excess of power resulted in a significant injustice to Citigroup. Bacon obtained benefits in excess of $500,000 from the use of her IRA funds from December 2001 through June 2002 to pay personal income tax and to keep her business

---

distributions for this request were split, with Randall's approval, among investment accounts to maintain an asset allocation, rather than draining one account and then another. Murrill, 9/20/05, pp. 114-15. Randall corroborated that testimony, so there is no conflicting testimony about this transaction. Randall, 9/19/05, pp. 130-31.

afloat so it could be sold in an orderly fashion.  She received $50,974 from the sale of the business, paid off more than $115,000 in federal and state income taxes and extinguished personal indebtedness of at least $350,000.  In conjunction with the panel's refusal to adjudicate Citigroup's claims against the admitted forger and refusal to apportion responsibility, the panel's award of $218,000 plus attorney's fees against Citigroup is an unjust additional windfall for Bacon.  Accordingly, the award must be vacated under Section 10(a) of the FAA and the case remanded to the Financial Industry & Regularity Authority ("FINRA"), the successor to the NASD, for rehearing consistent with this Court's Order and opinion.

WHEREFOR, PREMISES CONSIDERED, Citigroup Global Markets, Inc., formerly known as Salomon Smith Barney, Inc., hereby requests that this Court vacate the Award, and enter the following:

(1)    A take-nothing judgment as to Bacon's claims and judgment for damages of at least $88,000 on Citigroup's third-party claims against Randall Bacon;

(2)    Alternatively, an Order vacating the Award pursuant to 9 U.S.C. § 10(a) (2), (3) and (4), and remanding the case to FINRA for rehearing, consistent with this Court's order and opinion; and

(3)    Granting such other and further relief as the Court may deem just.

Respectfully submitted,

_____
Andrew R. Harvin
State Bar No. 09187900
USDC Southern District No. 1849

22

600 Travis Street, Suite 4700
Houston, Texas 77002
Telephone: (713) 228-5100
Facsimile: (713) 228-6138

*Attorney-in-Charge for Movant*
*Citigroup Global Markets, Inc.,*
*f/k/a Salomon Smith Barney, Inc.*

**OF COUNSEL:**

N. Kimberly Hoesl
State Bar No. 24040540
USDC Southern District No. 36881
**DOYLE, RESTREPO, HARVIN**
 **& ROBBINS, L.L.P.**
600 Travis Street, Suite 4700
Houston, Texas 77002
Telephone: (713) 228-5100
Facsimile: (713) 228-6138

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument was served upon the following counsel and party of record by electronic service, first class mail or facsimile on this 17th day of July, 2009:

Mr. Braden W. Sparks
Braden W. Sparks, P.C.
8117 Preston Road
800 Preston Commons West
Dallas, Texas 75225

Mr. Daniel R. Kirshbaum
Axelrod, Smith & Kirshbaum
5300 Memorial, Suite 700
Houston, Texas  77007-8292

Mr. Randall Bacon
909 Texas, #1803
Houston, TX 77002

N. Kimberly Hoesl

# APPENDIX A

## TO

## CITIGROUP GLOBAL MARKETS, INC.'S REPLY ON AMENDED MOTION TO VACATE ARBITRATION AWARD

04—1917 CM

## NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC.
## DIVISION OF ARBITRATION

|  |  |
|---|---|
| In the Matter of the Arbitration Between: § | AM 9:30 MAR30'04 |
| §  | |
| **DEBRA M. BACON** § | |
| § | |
| Claimant § | Case No. _____ |
| § | |
| **vs.** § | |
| § | |
| **SALOMON SMITH BARNEY, INC.** § | |
| § | |
| Respondent. § | |
| § | |

### UNIFORM SUBMISSION AGREEMENT

1.      The undersigned party, hereby submits the present matter in controversy, as set forth in the attached Statement of Claim, Answers, and all related Counterclaims, and/or Third-Party Claims which may be asserted, to arbitration in accordance with the Constitution, By-laws, Rules, Regulations, and/or Code of Arbitration Procedure of the sponsoring organization.

2.      The undersigned party hereby states that she has read the procedures and rules of the sponsoring organization relating to arbitration.

3.      The undersigned party agrees that in the event a hearing is necessary, such hearing shall be held at a time and place as may be designated by the Director of Arbitration or the arbitrator(s).  The undersigned party further agrees and understands that the arbitration will be conducted in accordance with the Constitution, By-laws, Rules, Regulations, and/or Code of Arbitration Procedure of the sponsoring organization.

4.      The undersigned party further agrees to abide by and perform any award(s) rendered pursuant to this Submission Agreement and further agrees that a judgment and any interest due thereon, may be entered upon such award(s) and, for these purposes, the undersigned party hereby voluntarily consents to submit to the jurisdiction of any court of competent jurisdiction which may enter such judgment.

### CLAIMANT'S SIGNATURE

*Debra M. Bacon*

**Debra M. Bacon**

*UNIFORM SUBMISSION AGREEMENT*

NATIONAL ASSOCIATION OF SECURITIES DEALERS INC.

**In the Matter of the Arbitration Between**

DEBRA BACON,

                    Claimant,                    :

          v.                                     :     **NASD #04-01917**

CITIGROUP f/k/a SALOMON SMITH BARNEY, et al.,    :

                    Respondent.                  :

1. The undersigned parties hereby submit the present matter in controversy as set forth in the attached Statement of Claim, answers, cross-claims and all related counterclaims and/or third party claims which may be asserted, to arbitration in accordance with the Constitution, By-Laws, Rules, Regulations and/or Code of Arbitration Procedure of the sponsoring organization.

2. The undersigned parties hereby state that they have read the procedures and rules of the sponsoring organization relating to arbitration.

3. The undersigned parties agree that in the event a hearing is necessary, such hearing shall be held at a time and place as may be designated by the Director of Arbitration or the arbitrator(s). The undersigned parties further agree and understand that the arbitration will be conducted in accordance with the Constitution, By-laws, Rules, Regulations and/or Code of Arbitration Procedure of the sponsoring organization.

4. The undersigned parties further agree to abide by and perform any award(s) rendered pursuant to this Submission Agreement and further agree that a judgment and any interest due thereon, may be entered upon such award(s) and, for these purposes, the undersigned parties hereby voluntarily consent to submit to the jurisdiction of any court of competent jurisdiction which may properly enter such judgment.

5.   IN WITNESS WHEREOF, the parties hereto have signed and acknowledged the foregoing Submission Agreement.

**Respondent Citigroup f/k/a Salomon Smith Barney Inc.**

_William A. Hohauser, Director & Associate General Counsel_

WILLIAM A. HOHAUSER
Director & Associate General Counsel
Attorney for Respondent

DATE:   5/12/04

2