IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CITIGROUP GLOBAL MARKETS, INC., f/k/a SALOMON SMITH BARNEY, INC., § § § | | |
| Movant, § | CIVIL ACTION NO. H-05-3849 | |
| § | | |
| DEBRA M. BACON, § § | | |
| Respondent. § | | |

## CITIGROUP GLOBAL MARKETS, INC.'S MOTION FOR SANCTIONS

TO THE HONORABLE UNITED STATES DISTRICT COURT:

Movant, Citigroup Global Markets, Inc., formerly known as Salomon Smith Barney, Inc. ("Citigroup") asks this Court to impose sanctions against Respondent Debra M. Bacon ("Bacon") and her counsel for filing papers presenting factual and legal arguments which either lack any evidentiary support or are based upon mischaracterizations of the record, in violation of Federal Rule of Civil Procedure 11(b), and would respectfully show the following:

**I.
Background**

On May 22, 2009, Citigroup (on remand from the Fifth Circuit Court of Appeals) filed its brief in support of its motion to vacate the arbitration award in this case. On July 2, 2009, Bacon filed her Response[1] to Citigroup's brief. In her Response, Bacon misrepresented the evidentiary record, even as to previously undisputed facts, in order to retool her arguments on negligence, damages, and apportionment of liability. Citigroup filed

---

[1] Debra M. Bacon's Response to Amended Brief in Support of Citigroup Global Market Inc.'s Motion to Vacate Arbitration Award (On Remand from the Fifth Circuit Court of Appeals).

its reply on July 17, 2009, itemizing the record misrepresentations in detail and advising the Court and counsel that Citigroup was considering filing a motion for sanctions. On July 21, 2009, despite having an opportunity to withdraw the misrepresentations, Bacon filed a Surreply[2] attempting to justify her prior mischaracterizations of the record. Bacon not only ignored misrepresentations identified by Citigroup but also re-asserted most of them, again presenting this Court with an inaccurate recitation of the record. Citigroup believes it is imperative that the record not be distorted and therefore moves for sanctions as to the following statements asserted in Bacon's Response to Citigroup's brief:[3]

> 1. *"There is no evidence in the record that Debra guaranteed the pizza business or any other specific business obligations Randall retired with stolen funds. Indeed the record suggests that he may have used her money to retire obligations for which only he was liable."* (Response, p. 13).

In her Response, Bacon provided no citation to the record to support this spurious claim. Why? Because the record flatly reveals that Bacon was either co-maker or guarantor on the following obligations that were satisfied from the proceeds of the sale of her business, a sale made possible only by the use of her IRA funds:

- A $280,000 note to the National Bank of South Carolina,[4] for the Bacons' second restaurant, for which $209,684 was still owed and satisfied at the time the Bacons' business was sold;[5]

---

[2] Debra M. Bacon's Surreply to the Reply Brief in Support of Citigroup Global Markets Inc.'s Motion to Vacate Arbitration Award (On Remand from the Fifth Circuit Court of Appeals).

[3] Citigroup believes that Bacon made additional misrepresentations in her Response and Surreply. However, Citigroup will address in this motion those that are most egregious.

[4] Randall, 9/19/05, pp. 123-24; R. Ex. 55; Bacon, 9/19/05, p. 213.

[5] Arnie, 9/21/05, pp. 171-72; R. Ex. 91, Tab 14.

- A June 9, 1997 Small Business Loan[6] from Comerica Bank, for $210,000 for which $53,626 was paid from the proceeds of the sale of Bacon's business;[7] and

- The lease on the second restaurant, for about $68,000 per year, which the sale of the business permitted the Bacons to assign to the new buyer, thus relieving Bacon of the burden of guaranteeing the lease.[8]

Bacon deliberately ignored this undisputed evidence and, incredibly, fabricated the statement that "there is no evidence…that Debra guaranteed the pizza business"! The record is also undisputed that Randall used the funds he transferred from Bacon's IRA accounts to retire tax and business obligations on which <u>both</u> he and Bacon were liable:

- In February 2002, Randall forged an IRA distribution form and, following a transfer to Bacon's joint family account, deposited the $150,000 net proceeds as a capital infusion in the ADI account (the Bacons' business account). Then, he paid $96,330 to the IRS, satisfying the Bacons' <u>joint</u> tax obligation, covered a negative balance of about $35,000 in that account, <u>and paid rent (which Bacon had guaranteed)</u> and other general business obligations.[9]

- Unbeknownst to Citigroup, the Bacons also owed the State of South Carolina income taxes in the amount of at least $27,000.[10] In June 2002, Randall

---

[6] Randall, 9/19/05, p. 126; R. Ex. 91, Tab 1, 3.

[7] Arnie, 9/21/05, p. 173; R. Ex. 91, Tab 14.

[8] Randall, 9/19/05, pp. 146-47; Arnie, 9/21/05, pp. 173-74; R. Ex. 91, Tab 14-15. In addition, Bacon was also co-maker on a home loan for $77,000 in November 2000. Bacon, 9/19/05, p. 214; Randall, 9/19/05, pp. 124-25; R. Ex. 56.

[9] Randall, 9/19/05, pp. 130-31; Arnie, 9/21/05, pp. 147-48, 155-57, 166-67; R. Ex. 91, Tab 11.

[10] Randall, 9/19/05, p. 142.

requested a disbursement of $18,000 from Bacon's IRA account and the last $10,000 from his own IRA account. Those funds were transferred to the Bacons' joint account and used to pay those state income taxes.[11]

In contrast to her misrepresentation, the testimony and the evidence unambiguously show that Randall used the money to keep the business afloat so that it could be sold for a profit, a sale which Randall admits, and Bacon does not dispute, could not have occurred had the business been closed due to defaults on those very same obligations.[12] Had the business been shuttered, Bacon would have retained all the business obligations she jointly owed, including $388,000 in bank loans as of the end of 2001[13] and at least $115,000 in tax obligations, with penalties and interest mounting and no means of payment.[14] Notably, Bacon does not address, much less correct, this misrepresentation in her Surreply at all.

> 2. *"On this analysis, the act of depriving Debra of her rights of ownership and placing the funds beyond her control was sufficient to support an award against Citigroup for the face amount of the instruments....Like the movant in Mouradian, Debra... never received any of the proceeds, and had no control or input into how the funds were used."* (Response, p. 16).

Bacon mischaracterizes the record on this point in an effort to argue that the panel's irrational Award could somehow be justified under New York law regarding ownership and control of funds even though the panel never considered New York law (*see* discussion

---

[11] Arnie, 9/21/05, pp. 169-70.

[12] Randall, 9/19/05, pp. 122-23, 141-42.

[13] Randall, 9/19/05, pp. 116-17; R. Ex. 26, 2001 Tax Return, at p. NBSC 00519. This amount included the amount owed on a $280,000 note to the National Bank of South Carolina which was jointly signed by both Randall and Bacon. Randall, 9/19/05, pp. 123-24; R. Ex. 55. Randall also testified that Bacon guaranteed $210,000 on the SBA loan and was a co-maker on a $77,000 home loan. Randall, 9/19/05, pp. 124-26; R. Ex. 56.

[14] Randall, 9/19/05, pp. 132-34, 142; Arnie, 9/21/05, pp. 169-70. Arnie testified that Bacon received benefits from the use of her funds of more than $522,000 to pay taxes and joint business obligations. Arnie, 9/21/05, pp. 174-75; R. Ex. 91.

*infra*), and to divert the Court's attention from the dispositive fact that Bacon has already received the benefit of the money at issue and so has suffered no damages due to any action or omission by Citigroup.

First, Bacon's conclusion under New York law is simply wrong because, in addition to New York law not controlling in this case, Bacon was not deprived of ownership and control of the money by Citigroup. Each of the three transfers in question, totaling $218,000 (after withheld taxes) went from Bacon's IRA to a <u>joint family account</u> over which Bacon admittedly had signature authority and control.[15] The money was then transferred to the joint business account.[16] For example, in February 2002, the amount of $150,000 was transferred to the joint family account.[17] Randall then transferred that money into the Bacons' business account for ADI, over which Bacon <u>also had authority</u> as an officer.[18] Citigroup did not deprive Bacon of her ownership or control of her funds in the disputed transfers because she had ownership and control over both the joint and business accounts to which the funds were moved.

---

[15] Randall, 9/19/05, pp. 46, 49, 161-62; Bacon, 9/19/05, pp. 183-84, 188-89. Transferring funds from Bacon's IRA account to the joint family account was standard procedure for the Bacons. For example, Bacon admitted telling her broker Brad Murrill that she and Randall would be funding the second restaurant from her IRA account. Bacon, 9/19/05, pp. 235-37. Further, Bacon signed eight letters of authorization to accomplish just that. Bacon, 9/19/05, pp. 191-92, 237-38; Murrill, 9/20/05, pp. 108-09; Cl. Ex. 5; R. Exs. 30-35A. Bacon controlled the tax consequences of her IRA withdrawals by consulting with her accountant who advised her on the timing of the withdrawals in order to minimize taxes. Bacon, 9/19/05, p. 244; Gordon, 9/20/05, pp. 24-25, 30-31. Bacon independently chose to allow Randall to request the transfer forms for her, and she never informed Citigroup that she was unable to review her monthly statements which itemized each transfer. Bacon, 9/19/05, p. 229, 234; Murrill, 9/20/05, pp. 106, 109.

[16] Note that these secondary transfers, from the joint family account to the business account, were not accomplished by forgery and are not the transactions at issue in this case.

[17] Randall, 9/19/05, pp. 130-31.

[18] That authority was never revoked. Randall, 9/19/05, pp. 149-50; Bacon, 9/19/05, p. 243; Murrill, 9/20/05, pp. 93-97; R. Ex. 1 at pp. 1892, 1892A.

Thus, Bacon's claim that she was deprived of ownership, control, and use of the money is simply false. If she ever lost ownership, control and use of the money, it was when Randall (not Citigroup) used money in Bacon's joint family account or the business account to pay taxes and obligations to keep their business alive. Despite the clarity of the record on this issue, Bacon repeats her misrepresentation in her Surreply where she again, in stark contrast to the record, denies that she had ownership and control of the money transferred to her joint account. (Surreply, p. 8).

Second, Bacon then misleadingly claims that she never received any of the proceeds of the transfers. The record is again undisputed that the money taken from her IRA accounts was used for her benefit. (*See* discussion, *supra*). Thus, she received the benefit of each of the unauthorized transfers. Bacon's glib analogy about stolen goods, set out in her Surreply, is incomplete and inaccurate. Randall's unauthorized transfer of Bacon's money is self-descriptive: a husband who used <u>the only money available</u> to the Bacons to pay the couple's joint tax obligations and to keep their jointly-owned business alive. In other words, Bacon suffered no loss because she ultimately received the full benefit or value of the money that was transferred.

> 3. *"Randall ultimately forged multiple distribution requests in order to pilfer $300,000 from Debra's separate IRA accounts at Citigroup, and $60,000 from her sole and separate severance pay accounts."* (Response pp. 9-10).

In an effort to inflate the principal loss and as support for the myth that the $218,000 Award perhaps represented the panel's attempt to apportion responsibility, Bacon improperly relies upon a $360,000 figure from her Property Settlement Agreement[19] with Randall,

---

[19] Bacon, 9/19/05, p. 203; Cl. Ex. 14; R. Ex. 38. The $360,000 figure was an estimate to which Randall agreed in the divorce proceedings. Randall was not represented by counsel but agreed to repay Bacon

despite the <u>undisputed</u> evidence that there were <u>only three forged transactions</u> at issue totaling a gross amount of $238,000, or $218,000 net of tax withheld. The $238,000 gross amount was cited by Bacon's counsel in both opening and closing arguments at the arbitration, and matches the amount transferred between December 2001 and June 2002, the time at which the unauthorized transfers admittedly occurred.[20] The $218,000 net figure matched, <u>to the penny</u>, the amount levied by the panel against Citigroup—representing 100% of the principal loss. There was no evidence at the hearing of $360,000 in unauthorized transfers at Citigroup. Randall's agreement to repay this arbitrary figure in the Property Settlement Agreement as damages he owed to Bacon is not evidence of damages for which Citigroup could be held liable.

    4.    *"As a result, Debra's quantified potential liability at the time of the divorce exceeded $900,000....Focusing exclusively on her Citigroup losses, Debra's $360,000 in retirement account losses, plus interest of $36,000, plus additional taxes and penalties on the early withdrawals of $82,000 totaled of [sic] $478,000."* (Response, p. 10).

Here, Bacon fabricates a new record, trying to inflate the numbers to perpetuate the myth that the panel may have apportioned liability against Citigroup. The record utterly fails to support this claim. First, the panel never was presented with an argument by anyone to the effect that Bacon had potential liabilities of $900,000, or even a $478,000 damage analysis. One can search the record for days, beginning with counsel's opening and closing arguments, and not find such assertions or figures.

---

$360,000 by, among other things, the sale of the business and through monthly payments of $2,083. Randall, 9/19/05, pp. 89-90, 101-02.

[20] *See, e.g.,* Claimant's Opening and Closing Arguments, 9/19/05, pp. 30-31; 9/21/05, pp. 222-23; Cl. Ex. 11; R. Ex. 91, Tab 3, 5.

Secondly, Bacon again adopts an inflated $360,000 damage figure, which was never at issue, and adds that figure to $515,000 in business loans and $82,000 in taxes and penalties to total more than $900,000 in "potential liability." (*See also* Surreply, pp. 3-4). This is misleading for two reasons. First, the tax and business obligations incorporated in this "potential liability" were obligations Bacon willingly assumed independently of Citigroup.[21] These were not the "losses" at issue, and they certainly were not losses attributable to Citigroup. Second, the IRA funds were not liabilities, but were <u>assets</u> which were employed to keep the business afloat and to satisfy her liabilities.[22] Bacon even agreed, in the 2002 Property Settlement Agreement, that Randall should continue to operate the business until it could be sold to satisfy their debts. So, her $900,000 and $478,000 figures for damages are illusory, without any support in the record.[23]

> 5. "*However, Randall testified that he had paid back 'nothing' on the unauthorized withdrawals under the PSA and probably could not do so for several years.*" (Response, p. 11).

This is yet another false twist on the testimony. Contrary to Bacon's statement in her Response, Randall did <u>not</u> testify that he could not begin paying Bacon back "for several

---

[21] Moreover, these obligations were not "losses" because, as the record undisputedly confirms, the joint business obligations were <u>entirely</u> satisfied using the money Randall transferred and the subsequent proceeds from the sale of the business.

[22] It is undisputed that the $218,000 in IRA transfers were used to pay more than $115,000 in federal and state income taxes (Randall, 9/19/05, pp. 140-42; Arnie, 9/21/05, pp. 147-48, 155-57, 169-701; R. Ex. 91, Tab 11) and to keep the business afloat so that it could be sold for $375,000 and the Bacons' joint liabilities paid. Randall, 9/19/05, pp. 145-48. In other words, Bacon deliberately ignores the benefit of more than $500,000 received from the use of her money, as Arnie testified. Arnie, 9/21/05, pp. 174-75; R. Ex. 91.

[23] Compounding her misrepresentations, in her Surreply, Bacon mischaracterizes Citigroup's argument that there is no evidence in the record of $360,000 in losses "<u>attributable to Citigroup</u>" and no evidence that the $478,000 damage figure was ever <u>argued or presented to the panel</u>. Surreply, p.2.

years." He testified that he would be unable to repay the <u>entire</u> amount owed for several years.[24]

In addition, Bacon ignores the fact that Randall testified that he intended to repay Bacon the full amount, regardless of any recovery Bacon may have from Citigroup, and that he had sent Bacon <u>$20,000</u> <u>just</u> <u>two</u> <u>weeks</u> before the arbitration hearing, to reimburse her for 2002 taxes.[25] Further, Randall admitted on cross-examination that he had arranged with his employer to have $1,000 monthly payments made to Bacon *beginning* September 2005, the month of the hearing.[26] So, Randall's initial testimony that he had paid back nothing was eviscerated on cross-examination, where it became obvious that he <u>had</u> paid Bacon something, and was to begin his $1,000 monthly payments the month of the hearing—again, very different from the representations in Bacon's Response and Surreply.

> 6. *"The panel could therefore have concluded that Citigroup's negligence contributed to Debra's losses of $478,000 or more and then, allocated damages on a 55/45 basis as to Citigroup and Randall."* (Response, p. 19).

All of Bacon's misrepresentations regarding damages supposedly support the mythical theory that the panel allocated total damages of $478,000, which has <u>absolutely no basis</u> in the record, on a 55/45 split. Setting aside the fact that the figure of $478,000 can be found nowhere in the arguments, the testimony, or the exhibits, this mythical allocation does not even match what the panel awarded: 55% of $478,000 is $262,900, and 45% is $215,100. The panel did not award either sum against Citigroup. To the contrary, the panel assessed 100% of the disputed withdrawals of $218,000 to Citigroup. The chances of the

---

[24] Randall, 9/19/05, pp. 90-91.

[25] Randall, 9/19/05, pp. 103-06, 108; Bacon, 9/19/05, pp. 204-05, 246.

[26] Randall, 9/19/05, p. 107; Bacon, 9/19/05, pp. 206, 255.

panel allocating any of the loss to Randall, the admitted forger, are <u>zero</u> given the panel's refusal to adjudicate Citigroup's claims against Randall.

    7.    *"Pursuant to a Uniform Submission Agreement mandating the application [sic] New York substantive law, a panel of three arbitrators heard the case, none of which were lawyers."* (Response, p. 12).

Bacon's assertion of New York law is extraordinarily brazen, given that the case was tried under Texas law. Bacon brought her written claims in arbitration under Texas law, specifically seeking damages pursuant to Sections 17.46 and 27.01 of the Texas Business and Commerce Code.[27] Blatantly ignoring this, Bacon now asserts that Texas law is "irrelevant"! (Surreply, p. 2).

The Uniform Submission Agreement does NOT mandate the application of New York law.[28] It is simply a party's representation and agreement to submit to the NASD's jurisdiction to arbitrate the case. The <u>absolute</u> truth is that <u>neither party</u> pled New York law, <u>neither party</u> argued or presented New York law in any form, and the panel <u>did not</u> have New York law before it.[29]

Bacon's efforts to bring New York law into an appeal, when there is no evidence that New York law in any form was ever presented to the panel, is a transparent attempt to rewrite history and should not be condoned as good faith argument.

---

[27] *See* Bacon's Statement of Claim in Arbitrators' Ex. 1. In addition, in her "Claimant's Response to Respondent's Brief on Selected Legal Issues," Bacon responded to Citigroup's arguments under Section 4.406 of the Texas Business and Commerce Code with additional arguments under the same code. In fact, Bacon even attached the Texas Uniform Commercial Code ("UCC"), Section 4.406 to the pleading. She did not raise or even mention the New York version of the UCC, then or at any other time in the arbitration.

[28] Arbitrators' Ex. 1, 9/19/05, p. 16.

[29] In her Surreply, Bacon then misstates Citigroup's argument and asserts that Citigroup's client agreement has a New York law choice of law clause. (Surreply, p. 2). Bacon misses the point—New York law was never pled, argued, or briefed to the panel.

10

    8.    *"Numerous facts support a rational conclusion that Citigroup acted negligently and in bad faith. These include the facts that...Debra's signature should have been reviewed by both the 'operations' and 'compliance' sections, and also, approved by management; that the failure to do so was in violation of company policy...."* (Response, pp. 19-20).

Despite Bacon's cherry-picking through the record, the evidence is undisputable that Citigroup's policy *did not* require review of the forged signatures. Jane Mouser, Assistant Branch Manager, presenting the <u>only</u> competent evidence of Citigroup's company policy, testified that Citigroup does not inspect the signatures for first-party transfers, *i.e.*, transfers from one of Bacon's accounts to another.[30] Bacon misleads the Court by citing speculative testimony of the broker, Brad Murrill, who testified that he had no personal knowledge of Citigroup's management review process relevant to these transfers.[31]

Bacon repeats this mischaracterization of the record in her Surreply by again relying solely upon Murrill's incompetent testimony. Of course, even the testimony Bacon cites does not support her position. She cites Murrill's testimony, including that (1) management had to sign off on each request and (2) "somebody" in operations was supposed to review each request. (Surreply, pp. 6-7). That is <u>all</u> Murrill testified to with regard to the management review process for IRA withdrawals. He never testified that someone was supposed to compare the signatures on the IRA distribution requests with new account forms, and he never testified that it was Citigroup's policy to always review and compare signatures. Murrill's testimony does not even prove that such a practice was required under industry standards. Thus, there is <u>no</u> <u>evidence</u> that Citigroup violated its review policy, and there is <u>no</u> <u>evidence</u> that its policy violated any industry standard. In her brief to the Fifth

---

[30] Mouser, 9/21/05, pp. 17-18.

[31] *E.g.*, Murrill, 9/20/05, pp. 138-39.

11

Circuit, Bacon tellingly opined that the failure to review the signatures was only "in *arguable* violation" of policy.[32] Her use of the term "arguable" underscored the truth—that she made that "metaphysical leap" in inference when there really was no evidence to support such a position.

## II.
## The Misrepresentations Have Not Been Withdrawn

Since Citigroup served its reply on its motion to vacate the arbitration award, describing in detail each of Bacon's misrepresentations of the record, Bacon has neither withdrawn nor modified her Response as to the misrepresentations listed in this motion. To the contrary, Bacon tried to bolster the misrepresentations in her Surreply. More than twenty-one days has elapsed since Bacon was put on notice of the misrepresentations. FED. R. CIV. P. 11(c)(2).

## III.
## Sanctions Are Warranted

A party and her attorney violate Rule 11 when they submit a filing to the Court that contains factual representations or denials of factual representations that have no evidentiary support and are not warranted by the evidence. FED. R. CIV. P. 11(b)(3)-(4). Moreover, the Court has the inherent authority to impose sanctions against attorneys and/or parties appearing before it when it specifically finds that they have engaged in bad faith conduct. *See In re Yorkshire, LLC*, 540 F.3d 328, 332 (5th Cir. 2008) (imposing sanctions against parties who filed bankruptcy petition in bad faith).

---

[32] Bacon's "Brief of Plaintiff-Appellant" to the Fifth Circuit, p. 25.

This Court should impose sanctions against Bacon and her counsel for filing a Response and Surreply which misrepresent testimony, concoct mythological loss figures, and conclude that the law under which the case was tried is irrelevant. Both Bacon and her counsel are clearly in possession of the correct record, yet they nonetheless filed these pleadings, fully aware that they contained allegations and other factual contentions that, at best, utterly lack evidentiary support and, more often, are completely contradicted by the record itself. *See* FED. R. CIV. P. 11(b)(3), (4).

In *O'Brien v. Alexander*, 101 F.3d 1479 (2d Cir. 1996), the plaintiff brought tort claims including malicious prosecution against the defendants who had previously sued, and then voluntarily dismissed their suit against, the plaintiff. In oral argument before the district court on a motion to dismiss the plaintiff's claims, plaintiff's counsel stated that, when the first proceeding was dismissed, nothing had been proved and nothing had been properly pleaded. *Id.* at 1483. However, the original district court in the first case had denied a motion to dismiss, finding that the complaint was properly pleaded. *Id.* The *O'Brien* court of appeals affirmed that the statement was "totally lacking in evidentiary support and is flatly contradicted by Judge Haight's decision of July 19, 1993." *Id.* at 1490. The court affirmed sanctions for the statement as it was made "utterly lacking in support." *Id.* at 1489.

In *Elliott v. M/V LOIS B.*, 980 F.2d 1001 (5th Cir. 1993), the plaintiff falsely pleaded in her complaint, and maintained throughout trial, that she acquired title to the disputed boat when, in fact, the transfer of title was fraudulent and the plaintiff knew it. The district court awarded Rule 11 sanctions of $35,000 in attorneys' fees for bringing the motion for sanctions. *Id.* at 1007.

Similarly, in *Truck Treads, Inc. v. Armstrong Rubber Co.*, 868 F.2d 1472 (5th Cir. 1989), the court of appeals affirmed an award of Rule 11 sanctions of more than $12,000 in attorneys' fees for misstatements made by plaintiff's counsel in opposition to a request for injunction. *Id.* at 1474-75. In that case, the attorney misrepresented the basis upon which a former case had been dismissed, using the misrepresentation to argue against subject matter jurisdiction in the present case. *Id.* at 1473.

Finally, even purportedly inadvertent errors can justify Rule 11 sanctions. In *Jenkins v. Methodist Hospitals of Dallas, Inc.*, 478 F.3d 255 (5th Cir. 2007), plaintiff's counsel in a racial discrimination case misquoted an affidavit in his brief in opposition to a motion for summary judgment, inserting a racially-charged word. *Id.* at 263. Despite plaintiff's counsel's plea that the error was an inadvertent mistake, the court held that attorneys are required to "stop and think" before making factual contentions, and the court imposed Rule 11 sanctions on the attorney. *Id.* at 265-66.

Given that this dispute has already been argued once before this Court and once before the Fifth Circuit, Bacon's and her counsel's obvious misstatements as to the record are not the result of mere carelessness, lack of time, or innocent misinterpretation. To the contrary, Citigroup even agreed to two extensions of time for Bacon to file her Response, so Bacon's counsel had ample time to review the record and write responsibly, with a fair depiction of the case as it was tried.

In spite of the record before them, Bacon and her counsel are attempting to retry the case under different law, with a new hypothetical damage model, to justify an irrational award. In doing so, they ignored the undisputed facts, fabricated loss figures, and distorted the testimony. Regrettably, Bacon and her counsel have crossed the line of reasonably

arguable inference and misled the Court as to the record in the case that was arbitrated. The Court should award Citigroup its attorneys' fees and expenses for replying to Bacon's Response, for preparing this motion, and for attending any hearing, all as evidenced by the Affidavit of Andrew R. Harvin filed in support of this motion. Citigroup's request for sanctions should be sufficient to deter the repetition of sanctionable conduct. FED. R. CIV. P. 11(c)(4). Such sanctions are justified given Bacon's and her counsel's cavalier attitude toward representing the record to this Court.

## IV.
## Conclusion

WHEREFORE, PREMISES CONSIDERED, Citigroup Global Markets, Inc., formerly known as Salomon Smith Barney, Inc., hereby requests that this Court grant this motion and (i) award sanctions of granting its attorneys' fees and expenses incurred in replying to Bacon's Response, for preparing this motion, and for attending the hearing, and (ii) grant such other relief to which it may be entitled.

Respectfully submitted,

_____
Andrew R. Harvin
State Bar No. 09187900
USDC Southern District No. 1849

600 Travis Street, Suite 4700
Houston, Texas 77002
Telephone: (713) 228-5100
Facsimile: (713) 228-6138

*Attorney-in-Charge for Movant
Citigroup Global Markets, Inc.,
f/k/a Salomon Smith Barney, Inc.*

OF COUNSEL:

N. Kimberly Hoesl
State Bar No. 24040540
USDC Southern District No. 36881
**DOYLE, RESTREPO, HARVIN
& ROBBINS, L.L.P.**
600 Travis Street, Suite 4700
Houston, Texas 77002
Telephone: (713) 228-5100
Facsimile: (713) 228-6138

## CERTIFICATE OF CONFERENCE

I certify that the undersigned conferred with Brad Sparks, counsel for Debra Bacon, by telephone on July 13, 2009, about the misrepresentations in Bacon's Response, and we were unable to reach an agreement as to the points in conflict. Bacon's counsel stated that Bacon would oppose any motion for sanctions. Therefore, this motion is presented to the Court for determination.

_____
Andrew R. Harvin

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument was served upon the following counsel and party of record by electronic service, first class mail or facsimile on this 18th day of August, 2009:

    Mr. Braden W. Sparks
    Braden W. Sparks, P.C.
    8117 Preston Road
    800 Preston Commons West
    Dallas, Texas 75225

    Mr. Daniel R. Kirshbaum
    Axelrod, Smith & Kirshbaum
    5300 Memorial, Suite 700
    Houston, Texas 77007-8292

    Mr. Randall Bacon
    909 Texas, #1803
    Houston, TX 77002

_____
Andrew R. Harvin