IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CITIGROUP GLOBAL MARKETS, INC., | § | |
| f/k/a SALOMON SMITH BARNEY, INC., | § | |
| | § | |
| Movant, | § | CIVIL ACTION NO. H-05-3849 |
| | § | |
| DEBRA M. BACON, | § | |
| | § | |
| Respondent. | § | |

## CITIGROUP GLOBAL MARKETS, INC.'S MOTION FOR SANCTIONS

**TO THE HONORABLE UNITED STATES DISTRICT COURT:**

Movant, Citigroup Global Markets, Inc., formerly known as Salomon Smith Barney, Inc. ("Citigroup") asks this Court to impose sanctions against Respondent Debra M. Bacon ("Bacon") and her counsel for filing papers presenting factual and legal arguments which either lack any evidentiary support or are based upon mischaracterizations of the record, in violation of Federal Rule of Civil Procedure 11(b), and would respectfully show the following:

### I.
### Background

On May 22, 2009, Citigroup (on remand from the Fifth Circuit Court of Appeals) filed its amended brief in support of its motion to vacate the arbitration award in this case. On July 2, 2009, Bacon filed her Response[1] to Citigroup's brief. In her Response, Bacon misrepresented the evidentiary record, even as to previously undisputed facts, in order to bolster her arguments on negligence, damages, and apportionment of liability. Citigroup

---

[1] Debra M. Bacon's Response to Amended Brief in Support of Citigroup Global Market Inc.'s Motion to Vacate Arbitration Award (On Remand from the Fifth Circuit Court of Appeals).

filed its reply on July 17, 2009, itemizing the record misrepresentations in detail and advising the Court and counsel that Citigroup was considering filing a motion for sanctions.  On July 21, 2009, Bacon filed a Surreply[2] in which she once again re-asserted most of the misrepresentations, instead of withdrawing them (as we believe should have been done)..

Because of the misrepresentations in Bacon's response, Citigroup provided Bacon with a copy of its proposed motion for sanctions.[3]   After reviewing the motion, Bacon amended the Surreply, and then corrected her amended Surreply ("Corrected Amended Surreply"), withdrawing merely three of her nine record misrepresentations.   However, despite having had multiple opportunities, Bacon failed to withdraw or correct the other misstatements and mischaracterizations of the record in her Response.   In this motion, Citigroup addresses the most egregious of these misrepresentations:  that New York law played a role in the panel's award; that Bacon received no benefit from the use of her funds; that Bacon's purported damages exceeded the face value of the disputed transfers; and that Citigroup acted negligently and in violation of its own compliance procedures.[4]

---

[2] Debra M. Bacon's Surreply to the Reply Brief in Support of Citigroup Global Markets Inc.'s Motion to Vacate Arbitration Award (On Remand from the Fifth Circuit Court of Appeals).

[3] Citigroup filed its motion for sanctions on August 18, 2009, but then moved to withdraw the motion from the docket in order to comply with the Rules and to give Bacon ample time to review the motion and make the corrections necessary to render her pleading accurate.

[4] Citigroup believes that Bacon made additional misrepresentations in her Response and Surreply, but addresses these four misrepresentations as the most egregious.

**II.**
**The Misrepresentations**

**1.      The Panel Did Not Have New York Law Before It and Did Not Consider or Apply New York Law in Its Award.**

In her Response, and throughout subsequent filings, Bacon contends, in stark contrast to the plain face of the record, that the panel considered and correctly applied New York law:

> "*Pursuant to a Uniform Submission Agreement mandating the application [sic] New York substantive law, a panel of three arbitrators heard the case, none of which were lawyers.*" (Response, p. 12).

> "*Texas law is irrelevant.*" (Surreply, p. 2).

> "*Under New York law, if Citigroup failed to review the signatures, then the face amount of the checks is the proper measure of Debra's loss and allocation is not required.*" (Surreply, p. 5).

> "*Under New York law, the panel properly measured Debra's damages by the face amount of the instruments.*" (Surreply, p. 5).

> "*Citigroup itself presented and argued New York law.*"   (Corrected Amended Surreply, p. 3).

Bacon's assertion of New York law is extraordinarily brazen, given that the case was tried solely under Texas law.  First, Bacon brought her written claims in arbitration under Texas law, specifically seeking damages pursuant to Sections 17.46 and 27.01 of the Texas Business and Commerce Code.[5]  She is bound by the law under which she tried the case. *American Int'l Trading Corp. v. Petroleos Mexicanos*, 835 F.2d 536, 540 (5th Cir. 1987). Blatantly ignoring this, Bacon now asserts that Texas law is "irrelevant"!  (Surreply, p. 2).

---

[5] *See* Bacon's Statement of Claim in Arbitrators' Ex. 1.  In addition, in her "Claimant's Response to Respondent's Brief on Selected Legal Issues," Bacon responded to Citigroup's arguments under Section 4.406 of the Texas Business and Commerce Code with additional arguments under the same code. *See* Docket Entry 1-3.  In fact, Bacon even attached the Texas Uniform Commercial Code ("UCC"), Section 4.406 to the pleading. She did not raise or even mention the New York version of the UCC then or at any other time in the arbitration.

Second, contrary to Bacon's claim in her Response, the Uniform Submission Agreement does NOT mandate the application of New York law.[6]  It is simply a party's representation and agreement to submit to the NASD's (now FINRA's) jurisdiction to arbitrate the case.  In her Surreply, Bacon re-frames this argument claiming that Citigroup's client agreement has a New York choice of law provision.  (Surreply, p. 2).  Bacon misses the point—regardless of any choice of law provision, New York law _never_ was pled, argued, or briefed to the panel.  Bacon's sea change to New York law on appeal is a very deliberate, serious attempt to change the record and, thus, to mislead this Court.

Finally, grasping at straws, Bacon refers to two cases cited by Citigroup in its briefing to the panel, _Jaksich v. Thomson McKinnon Sec. Inc._, 582 F.Supp. 485 (S.D.N.Y. 1984) and _Goldberg v. Kidder Peabody & Co., Inc._, 991 F.Supp. 215 (S.D.N.Y. 1997), as purported evidence that Citigroup presented New York law to the panel.  Again, the record clearly contradicts this claim because, as Bacon fails to point out, both cases were cited as a footnote to the following paragraph from Citigroup's Brief in which _Texas_ law was advocated:

> Accordingly, under Texas law, the Bacons' claims are time-barred as to all withdrawals, except the last one of $18,000, made in June 2002.  As to that item, the Panel must apply the rules of comparative responsibility under Chapter 33.012 of the TEX. CIV. PRAC. & REM. CODE, since Randall Bacon has been named as a responsible party. TEX. BUS. & COMM. CODE § 4.406(e).  Smith Barney submits that the percentage of Randall Bacon's responsibility is 100% and, accordingly, Smith Barney is not liable for any loss.[7]

Citigroup's Brief to the panel could not be clearer.  Texas law was presented and argued to the panel by Citigroup on the dispositive issues, just as Bacon pled her claims

---

[6] Arbitrators' Ex. 1, 9/19/05, p. 16.

[7] _See_ Citigroup's Brief on Selected Legal Issues, p. 8, included at Tab 7 in the Appendix to "Citigroup Global Markets, Inc.'s Motion on Remand To Vacate Arbitration Award," filed on November 14, 2005.

under Texas law.  Also, the two footnoted cases were cited, *along with* cases from the Fifth Circuit, addressing the doctrine of ratification as it applies to claims of securities fraud. Neither of these cases addressed the statutory law under the Uniform Commercial Code, proportionate responsibility, or causation of damages, which are dispositive issues in this matter.  Bacon cannot, and has not, identified any part of the record where she or Citigroup argued New York law at all, yet Bacon persists in advocating an impossible scenario—that the panel must have just discerned and followed it intuitively.  The <u>absolute</u> truth is that <u>neither party</u> pled New York law, <u>neither party</u> argued New York law, and the panel <u>did not</u> have New York law before it.  Bacon's efforts to bring New York law into an appeal, when there is no evidence that New York law was presented to the panel, is a transparent attempt to rewrite history and should not be condoned as good faith argument.  Even worse, Bacon persists in presenting this fantasy despite having been afforded numerous opportunities to correct this distortion.

### 2.    Bacon Had Control, and Received the Full Benefit, of the Disputed Funds.

Bacon mischaracterizes the record on this point in an effort to argue that the panel's irrational award could somehow be justified under New York law regarding ownership and control of funds (even though the panel never considered New York law) and to divert the Court's attention from the dispositive fact that Bacon has received the benefit of the money at issue and has suffered no damages due to any action or omission by Citigroup:

> "*On this analysis, the act of depriving Debra of her rights of ownership and placing the funds beyond her control was sufficient to support an award against Citigroup for the face amount of the instruments….Like the movant in* Mouradian, *Debra… never received any of the proceeds, and had no control or input into how the funds were used.*" (Response, p. 16).

*"Debra 'benefited' from Randall's payment of business debts and taxes. False."* (Surreply, p. 3).

*"Debra had technical control over the pilfered money. False."* (Surreply, p. 3).

First, Bacon's argument under New York law is simply wrong because, in addition to New York law not controlling in this case, Bacon was not deprived of ownership and control of the money by Citigroup. Each of the three transfers in question, totaling $218,000 (after withheld taxes) went from Bacon's IRA to a joint family account over which Bacon admittedly had signature authority and control.[8] The money was then transferred to the joint business account.[9] For example, in February 2002, the amount of $150,000 was transferred to the joint family account.[10] Randall then transferred that money into the Bacons' business account for ADI, over which Bacon also had authority as an officer.[11] Citigroup did not deprive Bacon of her ownership or control of her funds in the disputed transfers because she had ownership and control over both the joint and business accounts to which the funds were moved.

---

[8] Randall, 9/19/05, pp. 46, 49, 161-62; Bacon, 9/19/05, pp. 183-84, 188-89. Transferring funds from Bacon's IRA account to the joint family account was standard procedure for the Bacons. For example, Bacon admitted telling her broker Brad Murrill that she and Randall would be funding the second restaurant from her IRA account. Bacon, 9/19/05, pp. 235-37. Further, Bacon signed eight letters of authorization to accomplish just that. Bacon, 9/19/05, pp. 191-92, 237-38; Murrill, 9/20/05, pp. 108-09; Cl. Ex. 5; R. Exs. 30-35A. Bacon controlled the tax consequences of her IRA withdrawals by consulting with her accountant who advised her on the timing of the withdrawals in order to minimize taxes. Bacon, 9/19/05, p. 244; Gordon, 9/20/05, pp. 24-25, 30-31. Bacon independently chose to allow Randall to request the transfer forms for her, and she never informed Citigroup that she was unable to review her monthly statements which itemized each transfer. Bacon, 9/19/05, p. 229, 234; Murrill, 9/20/05, pp. 106, 109.

[9] Note that these secondary transfers, from the joint family account to the business account, were not accomplished by forgery and are not the transactions at issue in this case.

[10] Randall, 9/19/05, pp. 130-31.

[11] That authority was never revoked. Randall, 9/19/05, pp. 149-50; Bacon, 9/19/05, p. 243; Murrill, 9/20/05, pp. 93-97; R. Ex. 1 at pp. 1892, 1892A.

Thus, Bacon's claim that she was deprived of ownership, control, and use of the money is simply false. If she ever lost ownership, control and use of the money, it was when Randall (not Citigroup) used money in Bacon's joint family account or the business account to pay taxes and obligations to keep their business alive.[12] Despite the clarity of the record on this issue, Bacon repeats her misrepresentation in her Surreply where she again, in stark contrast to the record, denies that she had ownership and control of the money transferred to her joint account. (Surreply, p. 8).

Second, Bacon then misleadingly claims that she never received any of the proceeds of the transfers. The record is again undisputed that the money taken from her IRA accounts was used for her benefit. Thus, she received the benefit of each of the unauthorized transfers. Bacon's glib analogy about stolen goods, set out in her Surreply, is incomplete and inaccurate. Randall's unauthorized transfer of Bacon's money is self-descriptive: a husband who used the only money available to the Bacons to pay the couple's joint tax obligations and to keep their jointly-owned business alive. In other words, Bacon suffered no loss because she ultimately received the full benefit or value of the money that was transferred.

3. **Bacon's Only Damages Are the Face Value of the Disputed Transfers, less Taxes Withheld, or $218,000.**

In an effort to inflate the principal loss and as support for the myth that the $218,000 award perhaps represented the panel's attempt to apportion responsibility, Bacon deceptively

---

[12] In February 2002, Randall used the $150,000 net proceeds from one forged IRA distribution to pay $96,330 to the IRS, satisfying the Bacons' joint tax obligation, to cover a negative balance of about $35,000 in the joint business account, and to pay rent (which Bacon had guaranteed) and other general business obligations. Randall, 9/19/05, pp. 130-31; Arnie, 9/21/05, pp. 147-48, 155-57, 166-67; R. Ex. 91, Tab 11. In June 2002, Randall requested a disbursement of $18,000 from Bacon's IRA account and the last $10,000 from his own IRA account, and used those funds to pay the South Carolina state income taxes owed by both Bacons. Randall, 9/19/05, p. 142. Arnie, 9/21/05, pp. 169-70.

argues that her purported damages vary anywhere from $360,000 to over $900,000, in stark contrast to the evidence on record:

> *"Randall ultimately forged multiple distribution requests in order to pilfer $300,000 from Debra's separate IRA accounts at Citigroup, and $60,000 from her sole and separate severance pay accounts."* (Response pp. 9-10).

> *"As a result, Debra's quantified potential liability at the time of the divorce exceeded $900,000....Focusing exclusively on her Citigroup losses, Debra's $360,000 in retirement account losses, plus interest of $36,000, plus additional taxes and penalties on the early withdrawals of $82,000 totaled of [sic] $478,000."* (Response, p. 10).

> *"The panel could therefore have concluded that Citigroup's negligence contributed to Debra's losses of $478,000 or more and then, allocated damages on a 55/45 basis as to Citigroup and Randall."* (Response, p. 19).

> *"No evidence of $360,000 in losses caused by Randall. False."* (Surreply, p. 2).

> *"No evidence supporting $478,000 in losses. False."* (Surreply, p. 2).

> *"No evidence of additional losses of $515,000. False."* (Surreply, p. 3).

> *"Debra's pre-divorce liability exposure was not $900,000 plus. False."* (Surreply, p. 4).

Contrary to her repeated misrepresentations, the <u>undisputed</u> evidence shows that there were <u>only</u> <u>three</u> <u>forged</u> <u>transactions</u> at issue totaling a gross amount of $238,000, or $218,000 net of tax withheld. The $238,000 gross amount was cited by Bacon's counsel in both opening and closing arguments at the arbitration, and matches the amount transferred between December 2001 and June 2002, the time at which the unauthorized transfers admittedly occurred.[13] The $218,000 net figure matched, <u>to the penny</u>, the amount levied by

---

[13] *See, e.g.,* Claimant's Opening and Closing Arguments, 9/19/05, pp. 30-31; 9/21/05, pp. 222-23; Cl. Ex. 11; R. Ex. 91, Tab 3, 5.

the panel against Citigroup—representing 100% of the principal loss.   Any of the other figures cited by Bacon are unsupported by the evidence and/or are not attributable to Citigroup in the first instance.

First, Bacon improperly relies upon a $360,000 figure from her Property Settlement Agreement[14] with Randall.   There was no evidence at the hearing of $360,000 in unauthorized transfers at Citigroup.  Randall's agreement to repay this arbitrary figure in the Property Settlement Agreement as damages he owed to Bacon is not evidence of damages for which Citigroup could be held liable.

Second, Bacon again adopts an inflated $360,000 damage figure, which was never at issue, and adds that figure to $515,000 in business loans and $82,000 in taxes and penalties to total more than $900,000 in "potential liability."  (*See also* Surreply, pp. 3-4).  This is misrepresentative for three reasons.  First, the argument is revisionist history, having never been made at hearing.   Second, the tax and business obligations incorporated in this "potential liability" were obligations <u>Bacon</u> <u>willingly</u> <u>assumed</u> independently of Citigroup.[15] These were not the "losses" at issue, and they certainly were not losses attributable to Citigroup.  Third, the IRA funds were not liabilities, but were <u>assets</u> which were employed to keep the business afloat and to satisfy her liabilities.[16]   Bacon even agreed, in the 2002

---

[14] Bacon, 9/19/05, p. 203; Cl. Ex. 14; R. Ex. 38.  The $360,000 figure was an estimate to which Randall agreed in the divorce proceedings.  Randall was not represented by counsel but agreed to repay Bacon $360,000 by, among other things, the sale of the business and through monthly payments of $2,083. Randall, 9/19/05, pp. 89-90, 101-02.

[15] Moreover, these obligations were not "losses" because, as the record undisputedly confirms, the joint business obligations were <u>entirely</u> satisfied using the money Randall transferred and the subsequent proceeds from the sale of the business.

[16] It is undisputed that the $218,000 in IRA transfers were used to pay more than $115,000 in federal and state income taxes (Randall, 9/19/05, pp. 140-42; Arnie, 9/21/05, pp. 147-48, 155-57, 169-701; R. Ex. 91, Tab 11) and to keep the business afloat so that it could be sold for $375,000 and the Bacons' joint

Property Settlement Agreement, that Randall should continue to operate the business until it could be sold to satisfy their debts. Thus, her $900,000 "potential liability" figure is illusory, without any support in the record.

All of Bacon's misrepresentations regarding damages supposedly support the mythical theory that the panel allocated total damages of $478,000, which has absolutely no basis in the record, on a 55/45 split. Setting aside the fact that the figure of $478,000 can be found nowhere in the arguments, the testimony, or the exhibits, this mythical allocation does not even match what the panel awarded: 55% of $478,000 is $262,900, and 45% is $215,100. The panel did not award either sum against Citigroup. To the contrary, the panel assessed 100% of the disputed withdrawals of $218,000 to Citigroup. The chances of the panel allocating any of the loss to Randall, the admitted forger, are zero given the panel's inexplicable and unjustifiable refusal to adjudicate Citigroup's claims against Randall, who admitted complete culpability yet somehow escaped any liability.

Bacon's attempt to fabricate a new record, trying to inflate the numbers to perpetuate the myth that the panel may have apportioned liability against Citigroup, is utterly unsupported by the evidence.

### 4. Citigroup Did Not Act Negligently or in Bad Faith and Fully Complied With Its Internal Compliance Policies.

In yet another attempt to fashion an argument undermined by the actual record, Bacon cherry-picks parts of Murrill's and Mouser's testimony, then mischaracterizes them to

---

liabilities paid. Randall, 9/19/05, pp. 145-48. In other words, Bacon deliberately ignores the benefit of more than $500,000 received from the use of her money, as Arnie testified. Arnie, 9/21/05, pp. 174-75; R. Ex. 91.

mislead this Court. She then compounds this misrepresentation by also mischaracterizing the

Citigroup Compliance Manual:

> *"Numerous facts support a rational conclusion that Citigroup acted negligently and in bad faith. These include the facts that...Debra's signature should have been reviewed by both the 'operations' and 'compliance' sections, and also, approved by management; that the failure to do so was in violation of company policy...."* (Response, pp. 19-20).

> *"No evidence that Citigroup's internal policy required signature-review. False."* (Surreply, p. 6).

> *"She claimed that Smith Barney did not need to verify Bacon's signature on the forgeries because there was 'no change in ownership' on the accounts. This claim was patently false, since Bacon's funds were transferred from a sole and separate account to a joint account. (See also the Compliance Manual discussion,* infra *at p.7)."* (Corrected Amended Surreply, p. 5) (internal citations omitted).

First, Bacon repeatedly cites Murrill's testimony that some kind of review process

exists, but then conveniently ignores Murrill's additional testimony that he had no

knowledge of what that process is.[17] While he speculated that there were "different levels of

management" involved, Murrill testified that he had no knowledge of the review

---

[17] Murrill, 9/20/05, pp. 152-53.

```
                          138
      17    Q.  What does Smith Barney review in connection
      18  with a distribution request?
      19    A.  I don't know what Smith -- what Smith Barney
      20  would review.
      21    Q.  Are you involved in the process of authorizing
      22  the distribution?
      23    A.  No, sir.
      24    Q.  Do you review the Distribution Request Form
      25  when it comes in?
                          139
      1     A.  No, sir.
```

Murrill, 9/20/05, pp. 138-39.

procedures.[18]  Bacon cites Murrill's testimony, including that (1) management had to sign off on each request and (2) "somebody" in operations was supposed to review each request. (Surreply, pp. 6-7).  That is all Murrill testified to with regard to the management review process for IRA withdrawals.

In fact, none of Murrill's testimony cited by Bacon supports her argument that Murrill confirmed the signature review process.  He never testified that someone was supposed to compare the signatures on the IRA distribution requests with new account forms, and he never testified that it was Citigroup's policy to always review and compare signatures. Murrill's testimony does not even prove that such a practice was required under industry standards.  Murrill's testimony amounts to nothing more than his belief that management performs some kind of review of IRA distribution requests.[19]  Given his admitted lack of personal knowledge as to the procedures actually followed by management, Murrill's testimony does not support any finding of negligence on the part of Citigroup.

---

[18] Bacon tries to deflect this by string-citing snippets of the record and claiming that Mouser was unable to competently explain why distribution requests were not signed by a manager or why cover pages were missing.  To the contrary, Mouser's testimony was clear and unequivocal on each point in issue. Citigroup received distribution requests by facsimile and that sometimes required approvals were initialed on the facsimile cover pages.  It was also explained that not all facsimile cover sheets or other documents were produced in discovery because either they could not be located or Bacon did not request them.  The absence of a fax cover page is not probative of anything.  Also, Citigroup maintained copies of documents at several stages of processing.  Documents from earlier stages (e.g., when received by operations from the customer) may not yet have reflected a manager's initials that another copy of the same document may later reflect.  As Mouser testified, without controversion, some of the documents presented by Bacon's counsel were copies from those earlier stages of the process where the required approvals had not yet been reflected on the pages.[1]  There is nothing in this testimony to show that the transfer requests were not properly reviewed and approved, according to Citigroup policy. Mouser, 9/21/05, pp. 71, 75-78, 80, 83.  Bacon's counsel included such incomplete forms in his hearing exhibits, as Citigroup's counsel pointed out in comparison to a more complete set of documents in Citigroup's exhibits. Murrill, 9/20/05, pp. 191-92; Mouser, 9/21/05, pp. 68-69.

[19] Murrill, 9/20/05, pp. 105, 151-52.

Second, the evidence is undisputable that Citigroup's policy *did not* require review of the forged signatures.   Jane Mouser, Assistant Branch Manager, presenting the <u>only</u> competent evidence of Citigroup's company policy, testified that Citigroup does not inspect the signatures for first-party transfers that do not involve a change in ownership, *i.e.*, transfers from one of Bacon's accounts to another.[20]

In an amended surreply, Bacon presents an entirely new argument based on the misrepresentation of Citigroup's Compliance Manual which Bacon now cites as providing an example of a change of beneficial ownership:

> Examples of change of beneficial ownership:
>
> John Smith to Mary Smith
> <u>Michael and Mary Jones to Mary Jones</u>

Corrected Amended Surreply, p. 7 (underlined in pleading).   With no further exposition, Bacon simply concludes that the Compliance Manual "demonstrates that Citigroup failed to follow its own policy in Bacon's case." *Id.*

A simple review of the cited text confirms the fallacy of Bacon's argument.   The underscored example shows a transfer from a joint account to an individual account.   In that example, Michael Jones *loses* ownership of the funds transferred.   This is patently not what occurred in this case.   Here, the funds were transferred from Bacon's individual account to her joint account, an account for which Bacon <u>did</u> <u>not</u> <u>lose</u> <u>ownership</u> <u>of</u>, <u>or</u> <u>signatory</u> <u>authority</u> <u>over</u>, <u>the</u> <u>transferred</u> <u>funds</u>.   Bacon also received at her home, and periodically reviewed, monthly statements, as well as confirmations, reflecting all account activity,

---

[20] Mouser, 9/21/05, pp. 17-18.

including year-to-date distributions.[21] Whether Bacon failed to review her statements after December 2001, or whether Randall hid them, is not the fault of Citigroup.  In any event, Mouser's testimony is not inconsistent with Citigroup's Compliance Manual

Thus, there is no evidence that Citigroup violated its review policy, and there is no evidence that its policy violated any industry standard.  In her brief to the Fifth Circuit, Bacon tellingly opined that the failure to review the signatures was only "in *arguable* violation" of policy.[22]  Her use of the term "arguable" underscored the truth—that she made that "metaphysical leap" in inference when there really was no evidence to support such a position.

## III.
## The Misrepresentations Have Not Been Withdrawn

Since Citigroup provided Bacon with a copy of its proposed motion for sanctions, describing in detail each of Bacon's misrepresentations of the record, Bacon has neither withdrawn nor modified her Response as to the misrepresentations listed above.  To the contrary, Bacon tried to bolster the misrepresentations in her Surreply and subsequent memoranda.  More than twenty-one days has elapsed since Bacon was put on notice of the misrepresentations.  FED. R. CIV. P. 11(c)(2).

## IV.
## Sanctions Are Warranted

A party and her attorney violate Rule 11 when they submit a filing to the Court that contains factual representations or denials of factual representations that have no evidentiary

---

[21] Murrill, 9/20/05, pp. 74-75, 78; R. Exs. 2, 4, 6, 8, 8A, 10, 10A, 12;  Bacon, 9/19/05, p. 212; Randall, 9/19/05, p. 137; Mouser, 9/21/05, pp. 24-25, 36-42; R. Exs. 1-16, 130, 131.

[22] Bacon's "Brief of Plaintiff-Appellant" to the Fifth Circuit, p. 25.

support and are not warranted by the evidence. FED. R. CIV. P. 11(b)(3)-(4). Moreover, the Court has the inherent authority to impose sanctions against attorneys and/or parties appearing before it when it specifically finds that they have engaged in bad faith conduct. *See In re Yorkshire, LLC*, 540 F.3d 328, 332 (5th Cir. 2008) (imposing sanctions against parties who filed bankruptcy petition in bad faith).

This Court should impose sanctions against Bacon and her counsel for filing a Response, Surreply, and Corrected Amended Surreply which misrepresent testimony, concoct mythological loss figures, and argues that the law under which the case was tried is irrelevant. Both Bacon and her counsel are clearly in possession of the correct record, yet they nonetheless filed these papers, fully aware that they contained allegations and other factual contentions that, at best, utterly lack evidentiary support and more often are completely contradicted by the record itself. *See* FED. R. CIV. P. 11(b)(3), (4).

In *O'Brien v. Alexander*, 101 F.3d 1479 (2d Cir. 1996), the plaintiff brought tort claims including malicious prosecution against the defendants who had previously sued, and then voluntarily dismissed their suit against, the plaintiff. In oral argument before the district court on a motion to dismiss the plaintiff's claims, plaintiff's counsel stated that, when the first proceeding was dismissed, nothing had been proved and nothing had been properly pleaded. *Id.* at 1483. However, the original district court in the first case had denied a motion to dismiss, finding that the complaint was properly pleaded. *Id.* The *O'Brien* court of appeals affirmed that the statement was "totally lacking in evidentiary support and is flatly contradicted by Judge Haight's decision of July 19, 1993." *Id.* at 1490. The court affirmed sanctions for the statement as it was made "utterly lacking in support." *Id.* at 1489.

In *Elliott v. M/V LOIS B.*, 980 F.2d 1001 (5th Cir. 1993), the plaintiff falsely pleaded in her complaint, and maintained throughout trial, that she acquired title to the disputed boat when, in fact, the transfer of title was fraudulent and the plaintiff knew it. The district court awarded Rule 11 sanctions of $35,000 in attorneys' fees for bringing the motion for sanctions. *Id.* at 1007.

Similarly, in *Truck Treads, Inc. v. Armstrong Rubber Co.*, 868 F.2d 1472 (5th Cir. 1989), the court of appeals affirmed an award of Rule 11 sanctions of more than $12,000 in attorneys' fees for misstatements made by plaintiff's counsel in opposition to a request for injunction. *Id.* at 1474-75. In that case, the attorney misrepresented the basis upon which a former case had been dismissed, using the misrepresentation to argue against subject matter jurisdiction in the present case. *Id.* at 1473.

Finally, even purportedly inadvertent errors can justify Rule 11 sanctions. In *Jenkins v. Methodist Hospitals of Dallas, Inc.*, 478 F.3d 255 (5th Cir. 2007), plaintiff's counsel in a racial discrimination case misquoted an affidavit in his brief in opposition to a motion for summary judgment, inserting a racially-charged word. *Id.* at 263. Despite plaintiff's counsel's plea that the error was an inadvertent mistake, the court held that attorneys are required to "stop and think" before making factual contentions, and the court imposed Rule 11 sanctions on the attorney. *Id.* at 265-66.

Given that this dispute has already been argued once before this Court and once before the Fifth Circuit, Bacon's obvious misstatements as to the record are not the result of mere carelessness, lack of time, or innocent misinterpretation. To the contrary, Citigroup even agreed to two extensions of time for Bacon to file her Response, and provided Bacon with ample time to review the proposed motion for sanctions and make the necessary

corrections to her pleadings. Therefore, there is no question that Bacon's counsel had more than sufficient time to review the record and write responsibly, with a fair depiction of the case as it was tried and pleaded.

In spite of the record before them, Bacon and her counsel are attempting to retry the case under different law, with a new hypothetical damage model, to justify an irrational, biased award. In doing so, they ignored the undisputed facts, fabricated loss figures, and distorted the testimony. Regrettably, Bacon and her counsel have crossed the line of reasonably arguable inference and misled the Court as to the record. The Court should award Citigroup its attorneys' fees and expenses for replying to Bacon's Response, for preparing this motion, and for attending any hearing, all as evidenced by the Affidavit of Andrew R. Harvin filed in support of this motion. Citigroup's request for sanctions should be sufficient to deter the repetition of sanctionable conduct. FED. R. CIV. P. 11(c)(4). Such sanctions are justified given Bacon's and her counsel's cavalier attitude toward representing the record to this Court.

## V.
## Conclusion

WHEREFORE, PREMISES CONSIDERED, Citigroup Global Markets, Inc., formerly known as Salomon Smith Barney, Inc., hereby requests that this Court grant this motion and (i) award sanctions, granting its attorneys' fees and expenses incurred in replying to Bacon's Response and Bacon's Corrected Amended Surreply for preparing this motion and for attending the hearing, and (ii) grant such other relief to which it may be entitled.

Respectfully submitted,

_____
Andrew R. Harvin
State Bar No. 09187900
USDC Southern District No. 1849

600 Travis Street, Suite 4700
Houston, Texas 77002
Telephone: (713) 228-5100
Facsimile: (713) 228-6138

*Attorney-in-Charge for Movant
Citigroup Global Markets, Inc.,
f/k/a Salomon Smith Barney, Inc.*

OF COUNSEL:

N. Kimberly Hoesl
State Bar No. 24040540
USDC Southern District No. 36881
DOYLE, RESTREPO, HARVIN
   & ROBBINS, L.L.P.
600 Travis Street, Suite 4700
Houston, Texas 77002
Telephone: (713) 228-5100
Facsimile: (713) 228-6138

## CERTIFICATE OF CONFERENCE

I certify that the undersigned conferred with Brad Sparks, counsel for Debra Bacon, by telephone on July 13, 2009, about the misrepresentations in Bacon's Response, and we were unable to reach an agreement as to the points in conflict. I further certify that Bacon's counsel was provided with a copy of Citigroup's proposed motion for sanctions which also detailed the misrepresentations at issue in this pleading. Bacon's counsel filed a Corrected Amended Surreply, but failed to correct or withdraw most of the misrepresentations. Bacon's counsel stated that Bacon would oppose any motion for sanctions. Therefore, this motion is presented to the Court for determination.

_____
Andrew R. Harvin

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument was served upon the following counsel and party of record by electronic service, first class mail or facsimile on this 6th the day of January, 2010:

        Mr. Braden W. Sparks
        Braden W. Sparks, P.C.
        8117 Preston Road
        800 Preston Commons West
        Dallas, Texas 75225

        Mr. Daniel R. Kirshbaum
        Axelrod, Smith & Kirshbaum
        5300 Memorial, Suite 700
        Houston, Texas 77007-8292

        Andrew R. Harvin