1              UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF TEXAS
2                  HOUSTON DIVISION

3   RESPONDENT                 .  C.A. NO. H-05-3849
    DEBRA M. BACON             .  HOUSTON, TEXAS
4                              .
    VS.                        .
5                              .
    MOVANT                     .
6   CITIGROUP GLOBAL MARKETS INC.  .
    formerly known as          .  SEPTEMBER 8, 2010
7   Salomon Smith Barney Inc.  .  10:00 A.M. to 11:26 A.M.

8

9                   TRANSCRIPT of HEARING
           BEFORE THE HONORABLE LYNN N. HUGHES
10               UNITED STATES DISTRICT JUDGE

11

12  APPEARANCES:

13

    FOR THE RESPONDENT:        MR. DANIEL R. KIRSHBAUM
14                             Axelrod Smith & Kirshbaum
                               5300 Memorial
15                             Suite 700
                               Houston, Texas   77007
16
                               MR. BRADEN W. SPARKS
17                             Braden W. Sparks PC
                               8117 Preston Road
18                             Suite 800
                               Dallas, Texas   75225
19

20
    FOR THE MOVANT:            MR. ANDREW R. HARVIN
21                             MS. N. KIMBERLY HOESL
                               Doyle, Restrepo, Harvin &
22                                  Robbins, LLP
                               600 Travis
23                             Suite 4700
                               Houston, Texas   77002
24
    Proceedings recorded by mechanical stenography, transcript
25  produced by computer-aided transcription.

1                        APPEARANCES CONTINUED

2

3   OFFICIAL COURT REPORTER:              MS. KATHY L. METZGER
                                          U.S. Courthouse
                                          515 Rusk
4                                         Room 8016
                                          Houston, Texas   77002
5                                         713-250-5208

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

1

2          *THE COURT:*  Thank you.  Be seated.

3               Good morning.

4          *MR. KIRSHBAUM:*  Good morning, Your Honor.

5          *MR. HARVIN:*  Good morning, Your Honor.

6          *THE COURT:*  Mr. Sparks, is it Bacon's position that

7  she stands by all the representations in the record, about her

8  representations about what's in the record?

9          *MR. SPARKS:*  I'm not sure I understand your question,

10 Your Honor.

11         *THE COURT:*  If Mr. Harvin can point out factual

12 recitations presented by Bacon that are not contained in the

13 record, then Bacon would concede she has done something

14 seriously wrong?

15         *MR. SPARKS:*  Your Honor, I'm not sure I understand the

16 Court's question.  I don't believe -- I'm not aware of anything

17 that Bacon has alleged or that I've alleged on Bacon's part --

18         *THE COURT:*  I have a question.  My question is:  Does

19 Bacon stand by the factual recitations about what is in the

20 arbitration record that are made in her papers?

21         *MR. SPARKS:*  Bacon stands by her pleadings and her

22 references to the record.

23         *THE COURT:*  All right.  Would you show me where the

24 panel says it relied on New York law?

25         *MR. SPARKS:*  There's no reference by the panel to that

1   effect, but the contract between the parties is a New York

2   contract and that's in the record.  I believe it was Exhibit

3   No. 7, Your Honor.  I identified that many times in my papers.

4          *THE COURT:*  Well, that's slightly different from

5   saying that the panel said something about relying on it, isn't

6   it?

7          *MR. SPARKS:*  I believe it's Document No. 7, Exhibit

8   38.  Your Honor, what I've said all along is that the record

9   supports the inference that the panel applied New York law

10  because there is a contract in the record that is a New York

11  law, that says that New York law applies.

12         *THE COURT:*  Well, Mr. Sparks, the problem here is that

13  Citigroup -- is that still its name?

14         *MR. HARVIN:*  Yes, Your Honor.

15         *THE COURT:*  Okay.  There's been a lot of aliases and

16  things adopted here in the last couple of years.  Citigroup

17  says that there are things in the record that contradict the

18  decision and there are things relied on that are not in the

19  record or not relevant, roughly.  That's not what it said, but

20  that a contract that calls for New York law is -- in the record

21  does not mean they're relying on it.  Now, that's -- but the

22  problem here is the reasonable suspicion of Citigroup that the

23  decision here was arbitrary.

24         *MR. SPARKS:*  I didn't understand that last word, Your

25  Honor, I'm sorry.

1    *THE COURT:*  Arbitrary.  It's not your hearing.  It's

2    my mumbling.

3           The fact that Bacon received no benefit from the

4    funds, how did she receive no benefit from the funds?

5    *MR. SPARKS:*  Your Honor, I don't believe I've ever

6    argued that she received no benefit from the funds.  What I've

7    argued is that the record supports an inference that the panel

8    could rationally have concluded that she had no control over

9    the funds, that she did not personally exercise control over

10   the funds, that she had --

11   *THE COURT:*  That's what happens when you let other

12   people do it, isn't it?  I'm more interested just in the

13   concept that she had no benefit.  It was her business.

14   *MR. SPARKS:*  I think what the evidence -- what the

15   record shows, Your Honor, is that there were over $900,000 in

16   damages that the panel could have found.

17   *THE COURT:*  No, I'm sorry, we're going to talk about

18   what I want to talk about.

19   *MR. SPARKS:*  I'm trying to, Your Honor.  I apologize.

20   *THE COURT:*  Was she an officer of the business?

21   *MR. SPARKS:*  Yes, sir.

22   *THE COURT:*  Is she a part owner of the business?

23   *MR. SPARKS:*  Yes, sir.

24   *THE COURT:*  Was she a partner of the other person

25   involved in the business?

1        *MR. SPARKS:*  I'm not sure if she was a partner, Your

2   Honor, but I just don't recall from the record.  I think she

3   was an officer in the entity.

4        *THE COURT:*  Well, no, not -- I didn't ask if she was a

5   partner in the entity.  She was a partner of the other

6   principal in the business, her husband.  Isn't that true?

7        *MR. SPARKS:*  I suppose one could arrive at that

8   conclusion, Your Honor.

9        *THE COURT:*  Where were they domiciled?

10        *MR. SPARKS:*  I believe they were domiciled in North

11   Carolina.

12        *THE COURT:*  That's my recollection.

13        *MR. HARVIN:*  South Carolina, I believe.

14        *THE COURT:*  Same thing.  And I take it it's not a

15   community property state?

16        *MR. HARVIN:*  I'm not exactly sure.

17        *THE COURT:*  We'll know in a minute.

18             All of the money that had been invested in the

19   business by either of the Bacons had come from property that

20   had been earned during the marriage?

21        *MR. SPARKS:*  Your Honor, without going back and

22   looking at the record, I couldn't aver to the Court that that's

23   true, but it certainly stands to reason.

24        *THE COURT:*  Well, my recollection is that both of them

25   had good jobs and when they took retirement, they took their --

1   that's my recollection, but that's my recollection.

2           *MR. SPARKS:*  That's true.

3           *THE COURT:*  And they earned it in Texas, right?

4           *MR. SPARKS:*  Well, I'm not sure.  No, I don't believe

5   they did earn it in Texas, because there was a pizza business

6   in South Carolina, as I recall.

7           *THE COURT:*  That's not what they retired from.

8           *MR. SPARKS:*  Well, her retirement funds were from her

9   employment with, I believe, with BP.

10          *THE COURT:*  And his were from something similar,

11  weren't they?

12          *MR. SPARKS:*  And hers were exempt as were her

13  retirement funds and they were in her sole and separate

14  retirement account.

15          *THE COURT:*  They were earned during the existence of

16  the marriage.

17          *MR. SPARKS:*  Your Honor, I honestly don't know whether

18  they were earned during the pendency of the marriage or not.

19          *THE COURT:*  How long were they married?

20          *MR. SPARKS:*  I don't recall.

21          *THE COURT:*  Do you recall?

22          *MR. SPARKS:*  Probably about 20 years, 20 or 25.

23          *THE COURT:*  And what was the face value of the

24  disputed transactions?

25          *MR. SPARKS:*  The checks were -- the face value of the

1  checks were $218,000.

2        THE COURT:  And what was the amount of damages claimed

3  by Bacon?

4        MR. SPARKS:  There was testimony over -- by three

5  witnesses over several hours regarding what could be construed

6  as damages.  And I think the issue is --

7        THE COURT:  Well, now, wait.  Tell me what that means.

8  What could be construed?

9        MR. SPARKS:  Well, I think the issue, Your Honor, is

10  whether -- is what the panel reasonably may have --

11        THE COURT:  No, sir, I'm asking you a question.

12        MR. SPARKS:  I'm trying to answer it.

13        THE COURT:  No, you're not.  I want to know what her

14  damages were.  Don't tell me that it's something that Oprah

15  would have thought were damages or the panel thought were

16  damages.  What harm did she suffer besides the loss of the

17  funds?

18        MR. SPARKS:  There was testimony in the record that

19  she and her husband lost $515,000, approximately, in business

20  losses.  There was testimony --

21        THE COURT:  Well, wait.  What does that have to do

22  with the checks?

23        MR. SPARKS:  There was testimony that there was

24  $360,000 lost from Randall's misuse of accounts at Salomon

25  Smith Barney.  $218,000 of that was the checks in issue.

1          *THE COURT:*  280?

2          *MR. SPARKS:*  218.  218.

3          *THE COURT:*  $218,000 of unauthorized withdrawals?

4          *MR. SPARKS:*  There's testimony that there was --

5          *THE COURT:*  Wait, wait.  Is that right?

6          *MR. SPARKS:*  $218,000 of unauthorized withdrawals that

7    were the subject of the arbitration, yes, Your Honor.

8          *THE COURT:*  Okay.

9          *MR. SPARKS:*  There were other unauthorized

10   withdrawals.

11         *THE COURT:*  Okay.  But that's not part of the

12   arbitration.

13         *MR. SPARKS:*  It was in the record, yes, sir.

14         *THE COURT:*  A man in a car wreck that is arbitrated

15   could have had other accidents, couldn't he?  But if they're

16   not part of the arbitration, they're not -- can't be part of

17   the damages.

18              Louisiana is the easternmost community property

19   state.  Texas would be next.

20              Explain to me how Smith Barney is responsible on

21   an arbitration under that account for losses in the business,

22   which you mentioned 518 or five hundred and some odd thousand

23   dollars of losses in the business.

24         *MR. SPARKS:*  I believe those losses preceded what

25   happened with Smith Barney.  I don't believe Smith Barney is --

1   in my personal view, I don't believe Smith Barney is

2   responsible for those losses.

3      *THE COURT:* So, why did Bacon present evidence about

4   those losses, unless it's just background?

5      *MR. SPARKS:* Because I believe it's rationally

6   inferable from the facts, Your Honor, that the panel could have

7   concluded that the damages were in excess of the $218,000.

8      *THE COURT:* How? How?

9      *MR. SPARKS:* By looking at the damages that were in

10   the record, including the $360,000 in the property settlement

11   agreement of divorce that included the $218,000, by looking at

12   the $82,000 in additional taxes and penalties that they had to

13   pay as a result of the withdrawal of the 218,000, by looking at

14   $36,000 in interest, as well as the 515,000, Your Honor.

15      *THE COURT:* Well, the interest -- the lost interest,

16   ignore that, because that's -- that only makes you whole for

17   the 218.  If somebody else has your 218 for a couple of years,

18   you get the interest.

19        How is a loss on other things a loss on this

20   account?

21      *MR. SPARKS:* Well, I think the issue before the panel,

22   Your Honor, if I may answer it in that manner, the question is

23   whether or not the panel could have allocated if the conclusion

24   is that Texas law applied.  And I believe that the panel could

25   have allocated if they concluded that $218,000 was the

1  responsibility of Salomon Smith Barney, but that Randall had

2  either used those moneys or had created other losses or caused,

3  I should say, other losses to Mrs. Bacon, as indicated by the

4  property settlement agreement which indicated $360,000 worth of

5  damages.  And just on that basis alone, it could be --

6      *THE COURT:*  So, by a post-train wreck agreement, the

7  malefactor, Randall Bacon, I'm assuming, can agree with his

8  victim, I'm assuming, to increase Smith Barney's

9  responsibility?  Is that what you're telling me?

10      *MR. SPARKS:*  No, sir.

11      *THE COURT:*  Well, that sounds like what you just told

12  me.

13      *MR. SPARKS:*  No, sir.  What I'm saying is that it's a

14  rational inference that the panel could have allocated the

15  $218,000 out of $360,000, that the property settlement

16  agreement indicated that Randall was responsible for by

17  misusing the Smith Barney accounts.

18      *THE COURT:*  Counsel, you cannot do that.  I don't

19  recall this argument from before.  That an after the fact

20  agreement between the wrongdoer and the victim for alternative

21  purposes increases the liability for wrongful dishonor.  Make

22  it a simple transaction.  This was a wrongful honoring.

23      *MR. SPARKS:*  Well, I don't agree with the Court's

24  statement of the sequence of events or the legal principles,

25  with all do respect, Your Honor.  I think it's you have a

1   property settlement agreement between a husband and wife in

2   which they agree that he misused her accounts and that that

3   resulted in $360,000 in damages.  She then brings an

4   arbitration against Salomon Smith Barney.

5           THE COURT:  I know those facts, counsel.  Stick to the

6   point.  Tell me what law.  First, you disagree with my

7   chronology.  Randall takes money out of the account.

8           MR. SPARKS:  No, I don't disagree that Randall took

9   money out of the account, Your Honor.

10          THE COURT:  All right.  After that it went into the

11  business.  The business failed, the next thing that happened;

12  is that right?

13          MR. SPARKS:  I can't address the relationship between

14  when the business failed candidly, Your Honor, because I'm not

15  sure that some of those damages hadn't already occurred.  I

16  believe that many of the business damages had already occurred

17  before that.

18          THE COURT:  As an economic proposition the business

19  had probably failed a year before.  But as a functional matter,

20  when did the business close?

21          MR. SPARKS:  I don't know, Your Honor.

22          THE COURT:  It was after the checks; is that right?

23          MR. SPARKS:  That's probably true, yes, Your Honor.

24          THE COURT:  And then when was the divorce petition?

25          MR. SPARKS:  I would have to look, Your Honor.  I

1  don't know.

2         *THE COURT:*  But it was after the business closed?

3         *MR. SPARKS:*  Yes -- well, it was after the checks were

4  written and she discovered that they had been forged.  I don't

5  know if that was before or after the business closed.

6         *THE COURT:*  When was the arbitration in relation to

7  the divorce?

8         *MR. SPARKS:*  After the divorce, Your Honor.

9         *THE COURT:*  And was the contract -- after the divorce

10  was finished.  So, the contract is before the arbitration?

11         *MR. SPARKS:*  Which contract are you referring to, Your

12  Honor?

13         *THE COURT:*  The contract between husband and wife

14  allocating --

15         *MR. SPARKS:*  The property settlement agreement?

16         *THE COURT:*  Whatever --

17         *MR. SPARKS:*  That's what the name of the document that

18  they used to settle their property settlement disputes in

19  divorce was called the property settlement agreement.

20         *THE COURT:*  And where did they get divorced?  In South

21  Carolina?

22         *MR. SPARKS:*  I believe so, Your Honor.

23         *THE COURT:*  Do you know?

24         *MR. HARVIN:*  I believe that's right, Your Honor.

25         *THE COURT:*  All right.  The chronology seems to be

just what I said.  There's a train wreck where Randall takes
money out of the account.  There's a divorce by which Randall
and Bacon agree on what all of these damages were.

     *MR. SPARKS:*  Well, that's not quite accurate, Your
Honor.  They agreed that there was $360,000 in funds that were
wrongfully taken by Randall from Debra's accounts.  It's not
clear, as I recall, which accounts it was and they didn't
discuss the $218,000 that were removed by forgery and, of
course, Salomon Smith Barney --

     *THE COURT:*  How were the others wrongfully taken if
the 218 was by forgery?

     *MR. SPARKS:*  Well, the record indicates that they were
wrongfully taken by Randall, but it is not specific as to how
it happened.

     *THE COURT:*  No, I'm sorry, by the record, you mean the
consensual arrangement between the spouses?

     *MR. SPARKS:*  By the record, Your Honor, I mean the
record in the arbitration that includes the property settlement
agreement that discusses the issues.

     *THE COURT:*  Is there any evidence of what that
wrongful taking consists of other than the agreement?

     *MR. SPARKS:*  I don't believe that there is, but the
agreement says that it was wrongfully taken from the accounts.

     *THE COURT:*  And we're back to what I said.  After the
train wreck, the two people involved in the train wreck get

1  together and agree on an amount of damages which then Bacon

2  says a third party owes.  There is no fact in the agreement.

3  There is a conclusion that he confesses to.  But there's

4  nothing to indicate that money ever came out of the account in

5  which the claim was being arbitrated.

6           Yes, sir.

7      *MR. SPARKS:*  I'm not sure that that's an accurate --

8      *THE COURT:*  But tell me where it is, counsel.

9      *MR. SPARKS:*  Well, I think where it is is that the

10  accounts, I believe -- it's been a long time, Your Honor, and I

11  apologize, but it's been a long time since I looked at that

12  property settlement agreement.  I think I may have a copy here.

13  But as I recall, to the best of my recollection, there was a

14  property settlement agreement that specified the accounts, the

15  names and numbers on the accounts.

16      *THE COURT:*  That's not what you just told me a minute

17  ago, and I don't recall ever having read it, but if I had, I

18  would have forgotten by now.  You told me there was no

19  recitation in there.  It was just a statement about they agreed

20  on these losses.

21      *MR. SPARKS:*  I apologize, Your Honor.  There was no

22  statement --

23      *THE COURT:*  Mr. Harvin, do you know whether it's in

24  there?

25      *MR. SPARKS:*  Your Honor, there was no statement as to

1    exactly how it was wrongfully taken.  There was a statement

2    that it was wrongfully taken.  I don't remember the exact terms

3    of art, but it was to the effect that he abused her accounts or

4    misused the money in her accounts or wrongfully took the money.

5    The account numbers I believe were listed.  They were her

6    accounts.  The total was $360,000.  There was nothing in the

7    property settlement agreement that discussed the fact that

8    $218,000 of that was from forgeries, but there is no way to say

9    that it is clear from that property settlement agreement that

10   that $360,000 did not come from the accounts that were

11   discussed in arbitration and there is a lot of --

12          *THE COURT:*  Well, other than the withdrawals presented

13   were the 218.

14          *MR. SPARKS:*  The only forged withdrawals were the 218.

15          *THE COURT:*  But before you can't prove something by

16   saying, okay -- you're like the prosecutor who says, well, we

17   proved he robbed this bank, so there are another nine robbed

18   banks that we don't know what happened, so he must have done

19   them.  Do you know whether there was anything --

20          *MR. HARVIN:*  I believe that Mr. Sparks' recitation

21   about the settlement agreement is correct.  But at the

22   arbitration hearing, and it was conceded by all parties, that

23   the amount of the unauthorized checks were 218,000.  I do know

24   that Mr. Bacon, Randall Bacon, agreed in the settlement

25   agreement to repay a sum of $360,000, but there was no evidence

1   that any sum more than $218,000 was withdrawn improperly by any
2   unauthorized withdrawal.
3        *MR. SPARKS:*  I would disagree with that last part,
4   Your Honor, because while it was true that there was nothing in
5   the property settlement agreement that indicated that more
6   than -- well, that any amount other than $360,000 was
7   improperly withdrawn, I don't believe there was any description
8   as to how it was withdrawn.  I think what happened at the
9   arbitration is that everybody agreed that there was 214,000 --
10  $218,000 in forged instruments and everybody agreed that that's
11  what the arbitration was about.  But I don't think that
12  constrains the panel from considering other damages that they
13  may have felt Randall was responsible for.
14       *THE COURT:*  It's not about feelings, counsel.  It's
15  about a contract.
16       *MR. SPARKS:*  Your Honor, if the issue is whether or
17  not the panel --
18       *THE COURT:*  What does Texas law say about forgery?
19  What are the damages for forgery?
20       *MR. SPARKS:*  Well, I apologize, Your Honor, but I
21  don't know -- I believe that the amount of damages -- I don't
22  know.  I can't --
23       *MR. HARVIN:*  Well, 4.406 of the Texas Business and
24  Commerce Code says that it's the amount of the unauthorized
25  withdrawal provided there has been timely notice given to the

1    bank.

2         *THE COURT:*  I know about your defenses, but you don't

3    get emotional distress.

4         *MR. HARVIN:*  No, and none of that was ever pled for.

5         *THE COURT:*  Business opportunities you might get

6    interest on, like any other pecuniary --

7         *MR. HARVIN:*  Perhaps.

8         *THE COURT:*  -- amount.

9         *MR. SPARKS:*  Well, my point, Your Honor, is I believe

10   that the testimony at the hearing involved all withdrawals.

11   Randall was present.  He testified about it.

12        *THE COURT:*  How much is collusive corroboration with

13   no specifics worth?  That's not evidence.

14        *MR. SPARKS:*  I believe it is, Your Honor.

15        *THE COURT:*  I know you believe it is.

16        *MR. SPARKS:*  Yes, sir.

17        *THE COURT:*  That wasn't the question.

18        *MR. SPARKS:*  Yes, sir.

19        *THE COURT:*  You have no specifics.  It wasn't pleaded.

20   And it's not recoverable when you claim -- you've got to prove

21   the wrongful withdrawal.  And at no point in the arbitration

22   were there drafts identified and presented and the dates so

23   that whatever defenses could apply.

24        *MR. SPARKS:*  There was testimony, Your Honor, I

25   believe, about the other losses.  There certainly was a

1  property settlement agreement in the record that could

2  consider --

3          *THE COURT:*  Counsel --

4          *MR. SPARKS:*  Yes, sir.

5          *THE COURT:*  -- we have discussed the property

6  settlement agreement.  It is evidence of an understanding

7  reached after the fact between two parties to solve their

8  differences.  It is not a fact about banking practices two

9  years earlier.

10         *MR. SPARKS:*  Well, Your Honor, I would respectfully

11  disagree with the facts.

12         *THE COURT:*  Quit saying that.  You're paid to disagree

13  when I say something that's averse to your client.  Just tell

14  me what the better fact or reasoning is.

15         *MR. SPARKS:*  Well, I believe that the property

16  settlement agreement has facts that the panel could have

17  considered.  I believe that the statements in there are facts.

18         *THE COURT:*  Well, they're facts of the assertion,

19  counsel, and they're a binding term between the parties, but

20  it's not original data.

21             Mr. Harvin, do you have the agreement handy?

22         *MR. HARVIN:*  I do not, Your Honor.

23         *THE COURT:*  Do we think it's somewhere in the volumes

24  of the record?

25         *MR. HARVIN:*  Oh, yes, sir.

1          *THE COURT:*  Anybody have an idea where?

2          *MR. SPARKS:*  Where it is in the record, Your Honor?

3          *THE COURT:*  Yes.

4          *MR. SPARKS:*  I know it was in the record, because the

5     entire arbitration record was placed before the Court, but I

6     can't tell you exactly where, I'm sorry.

7          *MR. HARVIN:*  We can locate it and give you a cite.

8          *THE COURT:*  How long is it?

9          *MR. SPARKS:*  It's not long.  It's about five or six

10    pages.

11         *THE COURT:*  Apparently it's an exhibit to 7, so she'll

12    go get it.

13         *MR. HARVIN:*  Thank you.

14         *MR. SPARKS:*  Your Honor, is it all right if I sit down

15    while she's getting it?

16         *THE COURT:*  Yes, sir.

17              Actually Wisconsin is the community property

18    state next.  It's more easterly than Louisiana by about half.

19              All right.  Mr. Harvin, do you have anything you

20    want to direct my attention to or correct?

21         *MR. HARVIN:*  Nothing other than on the -- well, I may

22    be just repeating what Your Honor already knows from the

23    papers.  I think our position is well-set out in the papers.  I

24    believe that this has been an effort to rewrite the case

25    under -- in certain circumstances a new record and under a new

1  law, New York law, in order to avoid the responsibility of the

2  panel to apportion liability and I --

3          *THE COURT:*  Well, what's New York law say?

4          *MR. HARVIN:*  What does New York law say?

5          *THE COURT:*  Yes.

6          *MR. HARVIN:*   The New York law provides, as Mr. Sparks

7  has briefed, that in the event that the bank is -- there's

8  liability against the bank for the failure to review the

9  signatures and there's essentially strict liability with no

10 need to apportion responsibility and that's why this New York

11 law has been brought forth for the first time at this stage in

12 the proceedings.  But it was never pled.  It was never argued.

13 It was never presented to the panel.  And, in fact, the

14 claimant in this case specifically pled Texas law and the

15 Business and Commerce Code, which we presented defenses under.

16          With respect to the various numbers, it's our

17 position that the $218,000 is the only figure that was

18 presented as a principal loss in the arbitration.  I will not

19 repeat what the Court has obviously analyzed with respect to

20 the settlement agreement, but this idea that there was $900,000

21 potential liability is just off the charts.  It was never

22 mentioned in the hearing.  It includes $515,000 in business

23 losses that the Bacons had without regard to Smith Barney's

24 involvement that they willingly assumed.

25          And then there is this hypothetical damage model

1   that the panel arrived at a $478,000 number and then allocated

2   it 55/45 split and there's no support for that number in the

3   first place.  That number is never mentioned in the record.

4   And the 55/45 split doesn't even get you to $218,000.  It gets

5   you to different numbers, as we briefed.  So, we believe that

6   that there is a serious misrepresentation of the record.

7          And I need to point out to Your Honor that as a

8   result of what we tried to point out to Bacon's counsel, that

9   three of the statements were withdrawn, but they stuck to the

10  New York law statement.  They stuck to the idea that there were

11  these various hypothetical damage models for which there's

12  nothing in the record to support and we just couldn't allow

13  that to go unaddressed.

14      *THE COURT:*  Did they subsist in the negligence, that

15  the panel expressly found that?

16      *MR. HARVIN:*  I'm sorry, Your Honor?

17      *THE COURT:*  That Smith Barney had negligently behaved

18  and had violated its own compliance procedures?

19      *MR. HARVIN:*  No, that argument -- that argument was

20  raised in this part of the proceeding, but when you look at the

21  compliance manual, the compliance manual specifically states

22  that a review or a signature comparison is necessary with

23  respect to those examples in which there was a change in

24  ownership.  And the example cited in the compliance manual,

25  such as -- what was it?  It was from a joint to a sole account.

1  It's completely opposite of what occurred here, because the --

2  one of the joint members, a Mary Jones and a John Jones, if you

3  transferred it to John Jones, Mary Jones loses ownership.  Here

4  it was from Mary Jones' IRA account to a joint account over

5  which she had signatory and control.  And that was the policy

6  to which Ms. Mouser testified, and that is, there was no need

7  to do a signature comparison with a new account form because

8  there was not a change of ownership.

9          And I would also point out there was no evidence

10  presented at the hearing that that was in any way different

11  from the standard practice in the industry.

12      THE COURT:  Well, a firm's own compliance standards do

13  not create obligations to third parties.  That's an internal

14  operating procedure that is designed to make sure they don't

15  have these kinds of problems.  Walmart's operating procedures

16  do not set the standard for slip and fall cases.  Texas law

17  does that.  And is negligence even an issue in the -- if you

18  pay a fraudulent check, you're liable, right?

19      MR. HARVIN:  The lack of ordinary care is an issue

20  potentially under 4.406 of the Commerce Code.  If the customer

21  gives adequate notice, then the bank pays for that check which

22  was unauthorized within 30 days preceding that notice.

23  However, if the plaintiff proves that there was a lack of

24  ordinary care on behalf of the bank or Smith Barney, then 4.406

25  requires the fact finder to allocate proportional

1   responsibility between the plaintiff's fault, if you will, and
2   the bank's fault.

3            *THE COURT:*  I guess I mostly had them immediately.

4            *MR. HARVIN:*  I'm sorry, Your Honor?

5            *THE COURT:*  I mostly had immediate objections, I
6   guess.

7            *MR. HARVIN:*  Your Honor, we found -- the settlement
8   agreement, for the Court's reference, is Respondent's Exhibit
9   38 at Docket No. 7.

10           *THE COURT:*  Do you have it there?

11           *MR. HARVIN:*  No, we do not.

12           *THE COURT:*  Okay.  All right.  Let's take a ten-minute
13   recess.

14       *(Recess from 10:58 a.m. to 11:08 a.m.)*

15           *THE COURT:*  Thank you.  Be seated.

16               All right.  Mr. Harvin, I'm going to deny your
17   motions for sanctions without prejudice.  They probably ought
18   to be carried with the rest of the case about abusive tactics,
19   to the extent that the pleadings misstate the facts, that will
20   bear both on whatever opportunities for post-judgment relief
21   there are and, of course, has some bearing on the merits of
22   this case, because if the case stated by one side is not
23   supported by the record, then that lends support to the other
24   side.  But I'm going to throw it in the mix and proceed like
25   that.  But Smith Barney having pointed out the inconsistencies

1  and having procured the retraction of several has been useful.

2          We have the pending motion to append and I'm

3  going to address that just as soon as I can, which will be

4  about a week.

5          Anything else, Mr. Sparks?

6       MR. SPARKS:  No, Your Honor.

7       THE COURT:  Mr. Harvin?

8       MR. HARVIN:  No, Your Honor.

9       THE COURT:  Oh, one more, and that reference is not

10  right.  We've now printed eight reams of stuff and didn't get

11  it.  So, would -- since you're here, Mr. Harvin, would you

12  please favor us with a courtesy copy of the transcript other

13  than -- we have three transcripts.  Is there more than that?

14       MR. HARVIN:  No, that's all.

15       THE COURT:  Those three.  Okay.  So, I have those

16  handy, but the --

17       MR. SPARKS:  I can easily provide the Court with a

18  copy of the property settlement agreement today, if you would

19  like me to do that, by fax.

20       THE COURT:  If you have a copy but --

21       MR. SPARKS:  I don't have one with me, but I can have

22  my office send one to you, Your Honor.  I can file it.

23       THE COURT:  No, don't file it.

24       MR. HARVIN:  Judge, we just called our office to go

25  back and have somebody pull it.

1    *THE COURT:*  Okay.  Well, either one of you can e-mail

2    it as an attachment to my case manager.  I don't want to file

3    it.  I want to be able to print it on my own machine myself

4    without going into the record.  There was some muttering by the

5    old clerk, not the young clerk, about that's the downside of

6    electronic filing.  No, it was just as hard to find them in the

7    file when you had paper files that were 8 inches thick and

8    perhaps misindexed by us, perhaps by you, and sometimes by all

9    of us.  And the advantages of electronic filing are phenomenal

10   for everybody, except you-all write docket entries even worse

11   than docket clerks did.  Y'all capitalize them unnecessarily.

12   No all caps.  Simplify them.  The computer cuts it off after --

13   you know, when you're looking for stuff, it truncates

14   especially like party names.  If it says so-and-so doing

15   business as and all that, it shouldn't be in the caption

16   anyway, but it just keeps me from being easily able to see what

17   the rest of the parties are.  So, help us, please.

18            All right.  Thank you, counsel.

19         *MR. HARVIN:*  Thank you.

20      *(Concluded at 11:26 a.m.)*

21                       *  *  *

22   I certify that the foregoing is a correct transcript from the

23   record of proceedings in the above-entitled cause, to the best

24   of my ability.
     /s/ *Kathy L. Metzger*

25   Kathy L. Metzger                    *11-1-10*
     Official Court Reporter             Date